**STATES MARINE LINES, INC.,**
Appellant,

v.

**George P. SHULTZ, Secretary of the
Treasury, et al., Appellees.**

No. 73-2065.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1973.

Decided June 14, 1974.

Gordon D. Schreck, Charleston, S. C. (Buist, Moore, Smythe & McGee, Charleston, S. C., on brief), for appellant.

Ronald A. Hightower, Asst. U. S. Atty. (John K. Grisso, U. S. Atty., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, WINTER, Circuit Judge, and TURK,* District Judge.

TURK, District Judge.

This case concerns the amenability to suit of certain federal officers allegedly responsible for consequential damages resulting from the seizure of plaintiff's property. The District Court concluded that the action could not be maintained because it is in substance an action against the United States and thus barred by its sovereign immunity. We vacate the dismissal order and remand the case for further proceedings.

I

The facts as set forth in plaintiff's complaint and not here disputed by defendants are as follows: The freighter SS Mani which had been chartered by the plaintiff, States Marine Lines, Inc., arrived at the Port of Charleston, South Carolina on September 7, 1971, with a cargo of general merchandise from far eastern ports destined for discharge at various ports along the East Coast of the United States. Shortly after its arrival, agents of the Bureau of Customs entered the vessel and seized a portion of her cargo without permission of the Master or States Marine. This confiscated cargo, which was subsequently appraised as having a domestic value of $39,619.45, was removed to the United States Customs House at Charleston.

Despite plaintiff's protests that the seizure was wrongful and its offer to post security to obtain release of its cargo, the District Director of Customs refused to surrender it. On September 20, 1971, government officers issued a notice to the Master of the SS Mani that certain of the seized items valued at $29,821.20 were being held subject to forfeiture for alleged violations of certain statutes of the United States and that those persons having an interest in the cargo should make application for return of the cargo and for remission or mitigation of the penalties levied. Accordingly, on November 11, 1971, after further efforts to negotiate release of the cargo had failed, a petition request-

---

* Sitting by designation.

ing remission or mitigation of the penalty and forfeiture was filed with the defendant Secretary of the Treasury stating that there had been no violation of the customs laws. Although the government officers knew or should have known that the seizure of the cargo was causing damage to plaintiff, no action was forthcoming on this petition despite repeated requests both verbally and in writing that action be taken.

On February 17, 1972, an additional notice was issued by the District Director of Customs that other cargo seized from the SS Mani, valued at $9,798.25, was also being held subject to forfeiture. On April 12, 1972, plaintiff filed an amended petition for remission or mitigation indicating that there was no basis for the seizure of the cargo and further indicating that the continued detention of the cargo was causing irreparable damage to those persons having an interest in it. The government officers failed to take action on this amended petition or to initiate forfeiture proceedings, despite continued requests both verbal and written that action be taken or that some arrangement be made for release of the cargo upon posting security during the pendency of the proceedings. The only explanation offered to plaintiff for the delay in acting on its petition was that of delay in the bureaucratic process or government "red tape."

Finally, on December 5, 1972, plaintiff forwarded a telegram to the Bureau of Customs in Washington, D. C., stating that if its petition were not acted upon by December 8th legal action would be taken. The telegram resulted in verbal assurances that some decision would be made, yet no decision was forthcoming. Meanwhile, plaintiff was forced to pay claims for nondelivery of the cargo which had been filed by the importers and ultimate purchasers of the seized merchandise. On January 19, 1973, States Marine took the legal action it had threatened by filing suit in U. S. District Court. It asked the court to order the defendants to institute forfei-

ture proceedings or in the alternative to restore the cargo to it. Additionally, incidental and consequential damages of $50,000 were alleged to have been suffered as a result of defendant's conduct.

In February, 1973, after the District Court Judge had issued an order to show cause why the defendants should not be ordered immediately to institute forfeiture proceedings or restore the cargo to States Marine, the Bureau of Customs rendered its decision that there had been no violation of law which would justify forfeiture and that the forfeiture of the cargo and associated penalties should be remitted and the cargo released. Thereafter, the District Court Judge granted the defendants' motion to dismiss on the ground that the suit was in substance against the United States and as such was barred by the doctrine of sovereign immunity.

II

There is no doubt that if this suit is in essence against the United States, then it is specifically prohibited as an exception to the waiver of sovereign immunity in the Federal Tort Claims Act. Title 28 U.S.C. § 2680 lists the exceptions to the waiver of sovereign immunity contained in Title 28 U.S.C. § 1346(b) including the following:

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

.    .    .    .    .    .

"(c) Any claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods or merchandise by any officer of customs or excise or any other law enforcement officer."

Thus the initial question is whether this suit is, in fact, against the sovereign and as such barred by the above exceptions. Of relevance to this question are two statutes bearing on the liability of customs officers. Title 28 U.S.C. § 2006 provides:

"Execution shall not issue against a collector or other revenue officer on a final judgment in any proceeding against him for any of his acts, or for the recovery of any money exacted by or paid to him and subsequently paid into the Treasury, in performing his official duties, if the court certifies that:

(1) probable cause existed; or

(2) the officer acted under the directions of the Secretary of the Treasury or other proper government officer.

When such certificate has been issued, the amount of the judgment shall be paid out of the appropriations of the Treasury."

Title 28 U.S.C. § 2465 provides:

"Upon the entry of judgment for the claimant in any proceeding to condemn or forfeit property seized under any Act of Congress, such property shall be returned forthwith to the claimant or his agent; but if it appears that there was reasonable cause for the seizure, the court shall cause a proper certificate thereof to be entered and the claimant shall not, in such case, be entitled to costs, nor shall the person who made the seizure, nor the prosecutor, be liable to suit or

judgment on account of such suit or prosecution."

If, as the District Court found, suits against customs officers were actually against the sovereign and barred by the exceptions in 28 U.S.C. § 2680(a) and (c) then the above statutes would be unnecessary. Yet these statutes have remained in effect and have been frequently construed and applied.[1] E. g., Agnew v. Haymes, 141 F. 631 (4th Cir. 1905); United States v. Tito Campanella Societa Di Navigazione, 217 F.2d 751 (4th Cir. 1954) and cases cited therein. Traditionally, customs officers have been held liable in their individual capacities for tortious conduct committed in the performance of their duties, Truth Seeker Co. v. Durning, 147 F.2d 54, 56 (2nd Cir. 1945); Dioguardi v. Durning, 139 F.2d 774, 775 (2nd Cir. 1944), and the statutes quoted above were obviously for the protection of such officers. See, e. g., Gelston v. Hoyt, 16 U.S. (3 Wheat.) 246, 4 L.Ed. 381 (1818); Averill v. Smith, 84 U.S. (17 Wall.) 82, 21 L.Ed. 613 (1872); The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897).

There is no indication that the exceptions in 28 U.S.C. § 2680(a) and (c) were meant to alter the established practice of holding customs officers personally liable for the improper performance of their duties, but it rather seems probable that these exceptions merely recognized the established procedure and the long-standing protections afforded by 28 U.S.C. §§ 2006 and 2465.[2] To con-

---

1. The provisions now contained in 28 U.S.C. § 2465 were initially enacted in 1799 and the predecessor to 28 U.S.C. § 2006 was first enacted in 1863. The history of both statutes is discussed in Agnew v. Haymes, 141 F. 631 (4th Cir. 1905) in which this court found the two statutes not to be inconsistent. Both statutes have been reenacted several times with changes in the phraseology of both statutes last being made in 1948.

2. The legislative history of the Federal Tort Claims Act contains no reference to the provisions now found in 28 U.S.C. §§ 2006 and 2465 probably because suits against individu-

al customs officers were not considered as being against the sovereign at that time. The Federal Tort Claims Act was enacted in 1947. See H.R.Rep.2245, 77th Cong., 2d Sess. 10 (1942); H.R.Rep.No.1287, 79th Cong. 1st Sess. 6 (1946); S S.Rep.No.1400, 79th Cong., 2d Sess. 33 (1946); Hearings on H.R. 5373 and H.R. 6463 Before the House Committee on the Judiciary, 77th Cong.2d Sess. (1942). In Nakasheff v. Continental Insurance Co., 89 F.Supp. 87 (S.D. N.Y.1950), a third-party suit against the Collector of Customs of the Port of New York, the court held that the suit was not against the United States despite the provi-

strue 28 U.S.C. § 2680(a) and (c) as to afford the protection of sovereign immunity to customs officers would drain 28 U.S.C. §§ 2006 and 2465 of any purpose. This, in turn, would violate the proposition that apparently inconsistent statutes should be construed to give effect to each. Baines v. City of Danville, 337 F.2d 579, 590 (4th Cir.), cert. denied, 381 U.S. 939, 85 S.Ct. 1772, 14 L.Ed.2d 702 (1964); Fanning v. United Fruit Co., 355 F.2d 147, 149 (4th Cir. 1966); Ely v. Veelde, 451 F.2d 1130, 1134 (4th Cir. 1971).

In concluding that this suit was in essence against the United States and thus barred by the doctrine of sovereign immunity, the court below relied upon the test of sovereign immunity set forth by the Supreme Court in Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963); Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Malone v. Bowdoin, 369 U.S. 643, 82 S. Ct. 980, 8 L.Ed.2d 168 (1962); and Larson v. Domestic and Foreign Corporation, 337 U.S. 682, 69 S.Ct. 1457, 93 L. Ed. 1628 (1949). As stated in Dugan v. Rank, supra,

> "The general rule is that a suit is against the sovereign if 'the judgment would expend itself on the public treasury or domain, or interfere with public administration,' Land v. Dollar, 330 U.S. 731, 738 [67 S.Ct. 1009, 91 L.Ed. 1202 (1947), or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' Larson v. Domestic & Foreign Corp., supra, at 704 [, 69 S.Ct. at 1468, 93 L.Ed. 1628]; Ex parte New York, 256 U.S. 490, 502 [41 S.Ct. 588, 591, 65 L.Ed. 1057] (1921)." 372 U. S. at 620.

■ The District Court Judge was of the opinion that if this suit were successful it would in all probability be paid by the United States.[3] He thus concluded that it came within the above rule and was in reality against the sovereign. It is of course possible, although it is by no means a foregone conclusion,[4] that some of the defendants could avail themselves of the provisions in 28 U.S.C. § 2006 in the event judgment were rendered against them. But even assuming that a judgment for plaintiff in this case would be paid by the sovereign, this fact does not necessarily bring the case within the above stated rule of sovereign immunity. It is clear that by its terms 28 U.S.C. § 2465, quoted supra, prevents judgments against a government officer in cases in which property is seized pursuant to an act of Congress and judgment in a subsequent forfeiture proceeding is entered for the claimant if the court certified there was reasonable cause for the seizure. In contrast, 28 U.S.C. § 2006 would apply to cases such as the instant case in which no forfeiture proceedings were instituted. See

sion in 28 U.S.C. § 2680(c) and notwithstanding that the collector might be reimbursed in the event of judgment against him under 28 U.S.C. § 2006.

3. The District Court Judge cited 28 U.S.C. § 2006, quoted above and 19 U.S.C. § 508 which provides:

"if any officer, or other person, executing or aiding or assisting in the seizure of goods, under any Act providing for or regulating the collection of duties on imports or tonnage, is sued for anything done in virtue of the powers given thereby, or by virtue of a warrant granted by any judge, or justice, pursuant to law, he may plead the general issue and give such Act and the special matter in evidence."

4. As provided by the statute (28 U.S.C. § 2006), in order for the government to pay a judgment the court would first have to certify that probable cause existed or that the officer responsible for the detention acted under the directions of the Secretary of the Treasury. Whether the defendants could satisfy either of these requirements remains to be seen, but the court notes that the seized goods were listed on the ships manifest and the record contains no explanation as to why the goods were seized. During oral arguments, however, the court was told, in response to its inquiry, that a partition had been constructed in one of the holds during the voyage thus altering the compartmentalization, which may have been in violation of customs regulations. This allegedly aroused the general suspicions of customs agents since the goods were not located where the agents expected them to be.

The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897). To say that because the sovereign may have to pay a judgment rendered against certain of its officers by virtue of 28 U.S.C. § 2006, such a judgment is barred by the doctrine of sovereign immunity, is in effect to say that by agreeing to pay, the sovereign need not do so. Thus, even assuming that a judgment against one or more of the named defendants would be paid by the sovereign, in order for 28 U.S.C. §§ 2006 and 2465 to be harmonized with 28 U.S.C. § 2680(a) and (c) the latter must be construed as not affecting the long-established practice of permitting suits against customs officers in their individual capacities.[5]

## III

But aside from the effect of 28 U.S.C. § 2006, it also appears that this case comes within an exception to the doctrine of sovereign immunity. In Dugan v. Rank, supra, after stating the test of sovereign immunity quoted above, the court restated the two well-established exceptions to this test:

"Those exceptions are (1) actions by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." 372 U.S. at 621–622.

For the reasons that follow this court is of the opinion that the manner in which the defendants have exercised their statutory powers may have violated the Fifth Amendment to the Constitution.

The statutory basis for the seizure of plaintiff's cargo is found in Title 19 U. S.C. §§ 482 and 1581.[6] Plaintiff does

---

5. In Baines v. City of Danville, 337 F.2d 579 (4th Cir.), cert. denied, 381 U.S. 939, 85 S. Ct. 1772, 14 L.Ed.2d 702 (1964) we stated with respect to a subsequent statute implicitly repealing an earlier statute:

"Unless the later statute contains, or carries with it, strong evidence of an intention to repeal the earlier, or to carve out an exception from it, a court's duty is to harmonize the two. We possess no legislative power of repeal. When we deal with valid statutes, our only role is to construe them." 337 F.2d at 590–591.

6. Title 19 U.S.C. § 482 provides:

Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial.

Title 19 U.S.C. § 1581 provides in part:

(a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under sections 1701 and 1703–1711 of this title, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

(e) If upon the examination of any vessel or vehicle it shall appear that a breach of the laws of the United States is being or has been committed so as to render such vessel or vehicle, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel or vehicle, liable to forfeiture or to secure any fine or penalty, the same shall be seized and any person who has engaged in such breach shall be arrested.

(f) It shall be the duty of the several officers of the customs to seize and secure any vessel, vehicle, or merchandise which shall become liable to seizure, and to ar-

not contend that there was no statutory basis for the initial seizure but does contend that the subsequent detention of the cargo for some seventeen months was an unconstitutional deprivation of property without due process of law. The relevant statutory provisions governing the action to be taken following a seizure of merchandise as occurred in this case are set forth in Title 19 of the United States Code.

Title 19 U.S.C. § 1602 provides:

"It shall be the duty of any officer, agent or other person authorized by law to make seizures of merchandise or baggage subject to seizure for violation of the customs laws, to report every such seizure immediately to the appropriate customs officer for the district in which such violation occurred, and to turn over and deliver to such customs officer any vessel, vehicle, merchandise or baggage seized by him, and to report immediately to such customs officer every violation of the customs laws."

Title 19 U.S.C. § 1603 provides:

"Whenever a seizure of merchandise for violation of the customs laws is made, or a violation of the customs laws is discovered, and legal proceedings by the United States attorney in connection with such seizure or discovery are required, it shall be the duty of the appropriate customs officer to report such seizure or violation to the United States attorney for the district in which such violation has occurred, or in which such seizure was made, and to include in such report a statement of all the facts and circumstances of the case within his knowledge, with the names of the witnesses and a citation to the statute or. statutes believed to have been violated, and on which reliance may be had for forfeiture or conviction."

Title 19 U.S.C. § 1604 provides:

"It shall be the duty of every United States attorney immediately to inquire into the facts of cases reported to him by customs officers and the laws applicable thereto, and if it appears probable that any fine, penalty or forfeiture has been incurred by reason of such violation, for the recovery of which the institution of proceedings in the United States District Court is necessary, forthwith to cause the proper proceedings to be commenced and prosecuted, without delay, for the recovery of such fine, penalty, or forfeiture in such case provided, unless, upon inquiry and examination, such United States attorney decides that such proceedings cannot probably be sustained or that the ends of public justice do not require that they be instituted or prosecuted, in which case he shall report the facts to the Secretary of the Treasury for his direction in the premises."

Title 19 U.S.C. § 1610 provides:

"If the value of any vessel, vehicle, merchandise, or baggage so seized is greater than $2,500, the appropriate customs officer shall transmit a report of the case, with the names of available witnesses, to the United States attorney for the district in which the seizure was made for the institution of proper proceedings for the condemnation of such property."

It is apparent from the above statutes that following the seizure of merchandise the government officers involved are not given unfettered discretion in proceeding with the disposition of the seized merchandise. The defendants have not stated what actions were taken following the seizure in this case nor have they offered any explanation other than "red tape" for the delay incurred. On the other hand, plaintiff asserts that the following events transpired: On September 20, 1971, thirteen days after the seizure, plaintiff received notice that approximately $30,000 of the seized cargo was being held subject to forfeiture and that persons having an interest in

rest any person who shall become liable to arrest, by virtue of any law respecting the revenue, as well without as within their respective districts, and to use all necessary force to seize or arrest the same.

the cargo should make application for its return or remission or mitigation of penalties; after failing in its attempt to negotiate release of the cargo, plaintiff filed a petition contending that there had been no violation of the customs laws; no action was taken on this petition despite plaintiff's requests, and on February 17, 1972, a second notice was issued stating that cargo in addition to that specified in the initial notice was also being held subject to forfeiture; plaintiff filed an amended petition for remission or mitigation on April 12, 1972, and despite repeated requests that action be taken, nothing was done until February, 1973, after the plaintiff had begun legal proceedings and the District Court Judge had issued an order for defendants to show cause why they should not be ordered to institute forfeiture proceedings or return the seized goods.

Although 19 U.S.C. § 1602 requires "immediate" action from a seizing officer in reporting such seizure to the appropriate customs officer and 19 U.S.C. § 1604 requires the United States attorney to "immediately inquire into the facts" and "forthwith" and "without delay" cause the proper proceedings to be instituted, 19 U.S.C. §§ 1603 and 1610 do not specifically direct that expeditious action be taken by customs officers in reporting seizures to the United States attorney. Thus the inordinate delay by defendants in this case was seemingly not in violation of the statutes, but plaintiff contends that the statutes, as applied to it in this case by the defendants amounted to a violation of its constitutional right secured by the Fifth Amendment not to be deprived of property without due process of law.

In United States v. Thirty-Seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) the Supreme Court considered the constitutionality of 19 U. S.C. § 1305(a) pursuant to which customs agents had seized thirty-seven allegedly obscene photographs from the claimant upon his return to the United States from Europe. Thirteen days after the seizure the United States Attor-

ney instituted forfeiture proceedings in the District Court, and the claimant challenged the constitutionality of the forfeiture statute on the ground that 19 U.S.C. § 1305(a) did not contain time limits insuring a prompt judicial determination as to whether or not the seized materials were obscene. The court construed the statute in order to save it from constitutional attack by requiring "no more than 14 days from seizure of the goods to the institution of judicial proceedings for their forfeiture and no longer than 60 days from the filing of the action to final decision in the district court." Id. at 373–374. Although the issue before the court was the constitutionality of 19 U.S.C. § 1305(a), the court commented by way of a footnote with respect to 19 U.S.C. §§ 1602 and 1604:

"The United States urges that we find time limits in 19 U.S.C. §§ 1602 and 1604. Section 1602 provides that customs agents who seize goods must 'report every such seizure immediately' to the collector of the district, while § 1604 provides that, once a case has been turned over to a United States Attorney, it shall be his duty to 'immediately inquire into the facts' and 'forthwith to cause the proper proceedings to be commenced and prosecuted, without delay', if he concludes judicial proceedings are appropriate. We need not decide, however, whether §§ 1602 and 1604 can properly be applied to cure the invalidity of § 1305(a), for even if they were applicable, they would not provide adequate time limits and would not cure its invalidity. The two sections contain no specific time limits, nor do they require the collector to act promptly in referring a matter to the United States Attorney for prosecution. Another flaw is that § 1604 requires that, if the United States Attorney declines to prosecute, he must report the facts to the Secretary of the Treasury for his direction, but the Secretary is under no duty to act with speed. The final flaw is that neither section re-

quires the District Court in which a case is commenced to come promptly to a final decision." 402 U.S. at 368 n. 2.

It is clear that the decision in United States v. Thirty-Seven Photographs may be distinguishable from the case at bar if it is read narrowly as involving primarily the court's concern with the government's use of forfeiture statutes to impose prior restraints on First Amendment rights. Such a distinction is of doubtful validity, for although it is true that the Supreme Court has expressed a particular aversion to the prior restraint of First Amendment rights, it has in recent years been equally solicitous in ensuring that persons not be deprived of property without due process of law. See Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 2d 287 (1970); Wheeler v. Montgomery, 397 U.S. 280, 90 S.Ct. 1026, 25 L.Ed.2d 307 (1970); Sniadach v. Family Finance Corporation, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). See also, Lynch v. Household Finance Corporation, 405 U.S. 538, 92 S.Ct. 113, 31 L.Ed.2d 424 (1972) in which the court stated:

"Property does not have rights. People have rights. The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is in truth a 'personal' right, whether the 'property' in question be a welfare check, a home or a savings account. In fact, a fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other. That rights in property are basic civil rights has long been recognized." 405 U.S. at 552.

When this court considers that the Supreme Court has interpreted the due process clause of the Fourteenth Amendment to require an evidentiary hearing by a State prior to the suspension of a driver's license, Bell v. Burson, supra; or the termination of welfare benefits, Goldberg v. Kelly, supra; or garnishment of wages, Sniadach v. Family Finance Corporation, supra; or the repossession of goods sold under a constitutional sales contract, Fuentes v. Shevin, supra, it would be incongruous indeed if the federal government were left completely unrestrained under the identical wording of the Fifth Amendment following the seizure of goods by customs officers. Plaintiff does not contend that it was entitled to an evidentiary hearing before the cargo was seized, but merely that the defendants' actions, or lack thereof, following the seizure amounted to a violation of its Fifth Amendment rights. In Fuentes v. Shevin, supra, Mr. Justice Stewart described certain "extra-ordinary situations" in which the court had allowed "outright seizure" without a prior hearing:

"First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: The person initiating the seizure has been a government official responsible for determining under standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." 407 U.S. at 91.

It is the third requirement stated above that has been violated in this case, and it is the considered opinion of this court that as in United States v. Thirty-Seven Photographs, supra, the statutes relative to the disposition of plaintiff's seized property (19 U.S.C. §§ 1602, 1603, 1604) must be limited as to the time involved in their application if they are to pass constitutional muster.

In Sarkisian v. United States, 472 F. 2d 468 (10th Cir. 1973), appeal docketed, No. 73–252, August 6, 1973, the owner of goods seized by customs agents sued for release of the goods contending that the delay in commencing forfeiture proceedings violated his Fifth Amend-

ment rights. The government had proceeded to forfeit the goods some nine months after the customs investigation had been completed and fourteen months after the initial seizure. The court considered only the time period which elapsed between the completion of the customs investigation and the filing of the forfeiture proceedings by the government. In finding this nine month delay to be an unconstitutional application of the relevant statutes (19 U.S.C. §§ 1602, 1603 and 1604) the court relied on United States v. Thirty-Seven Photographs, supra, stating "[t]he withholding of . . . property under the circumstances before us presents a constitutional claim of not less dignity than that arising from the dirty pictures." 472 F.2d at 472. The court in *Sarkisian* then held that 19 U.S.C. § 1603 must contain time limits comparable to 19 U.S.C. §§ 1602 and 1604 which, as noted above, speak in terms of "immediately" "forthwith" and "without delay".

The court in *Sarkisian* also indicated, without specifically so stating, that the fourteen day time limit required by the Supreme Court in United States v. Thirty-Seven Photographs between the seizure of the allegedly obscene photographs and the institution of forfeiture proceedings under 19 U.S.C. § 1305(a) should also be required under 19 U.S.C. §§ 1603 and 1604 governing the time between the completion of the investigation by customs officers and the institution of suit by the United States Attorney in order to save the statutory scheme from constitutional attack. So construed the court found that the statute had not been complied with which in turn dictated that the claimant's goods be released.

■■ While agreeing with the result of the court's opinion in *Sarkisian*, we do not go so far as to impose the precise time limits in United States v. Thirty-Seven Photographs to this case, noting that the Supreme Court there stated: "Of course, we do not now decide that these are the only permissible time limits. We note, furthermore, that consti-

tutionally permissible limits may vary in different contexts. . . ." 402 U.S. at 374. In the context of the First Amendment and particularly prior restraint of speech, by administrative action, the court has generally required greater precision in regulation than might be required in other constitutional contexts. See, e. g., Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1967); Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed. 2d 649 (1964); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L. Ed.2d 584 (1962). In the case before us, involving a Fifth Amendment challenge to the seizure of general merchandise, we do not consider it imperative to impose precise time limits on the administrative and judicial forfeiture process, but we do believe that 19 U.S.C. § 1603 must be construed so as to require "immediate" reporting of the seizure to the United States Attorney for the institution of forfeiture proceeding under § 1604. Of course, whether or not the requirement of "immediate" action is satisfied in any given case will depend upon factors such as the length of time necessary for an investigation by customs officers and whether delay in the proceedings is caused by the claimant. However, in the case before us the plaintiff has presented allegations considerably more egregious than those before the Tenth Circuit in *Sarkisian*, and accordingly, there is no question but that 19 U.S.C. §§ 1602, 1603, and 1604, insofar as they require expeditious administrative and judicial proceedings, have not been complied with. Furthermore, this failure to so comply, in the absence of explanation by defendants, amounts to a violation of plaintiff's Fifth Amendment right not to be deprived of property without due process of law. This being the case, the doctrine of sovereign immunity is no bar to an action against defendants in their individual capacities. Dugan v. Rank, 372 U.S. 609, 621, 622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

■ Having concluded that the plaintiff's allegations assert both federal

statutory and constitutional violations, jurisdiction in the District Court is readily available pursuant to 28 U.S.C. § 1331.[7] Additionally, since this suit is against the defendants in their individual capacities and not against the sovereign, the fact that the Court of Claims has jurisdiction under 28 U.S.C. § 1491 of claims against the United States founded upon the Constitution is of no moment.

## IV

Relying on the decision in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), plaintiff contends that the court should recognize a cause of action for money damages against the customs agents allegedly responsible for violating its Fifth Amendment rights.[8] In *Bivens* the court held that the Fourth Amendment right to be secure against unreasonable searches and seizures would support a federal cause of action for damages consequent upon a violation of that right. Thus the question posed is whether a cause of action should similarly be recognized for a Fifth Amendment claim.

Decision of this question begins with consideration of the opinion in *Bivens*. The court there rejected the government's argument that the protection of the rights secured by the Fourth Amendment should be left to state tort law with the role of the Fourth Amendment limited to that of possibly providing a defense to such actions. The court noted that such an approach would limit the protection afforded by the Fourth Amendment to cases in which the conduct of federal agents complained of was remediable under state law, which in turn would not necessarily include all conduct proscribed by the amendment.

In this regard the court pointed out that the interests protected by state law and those protected by the Fourth Amendment might "be inconsistent or even hostile." 403 U.S. at 394. In justifying its creation of a compensatory remedy for Fourth Amendment violations the court quoted from its earlier decision in Bell v. Hood, 327 U.S. 678, at 684, 66 S. Ct. 773, at 777, 90 L.Ed. 939 to the effect that "it is . . . well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." The court also rejected the government's suggestion that the availability of money damages should depend upon whether such relief was necessary to enforce the constitutional protection, stating:

> "The question is merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts." 403 U.S. at 397.

With one possible exception, nothing said in *Bivens* would limit the application of the principles enunciated therein to the case at bar. The single exception could be the court's statement that "[h]istorically damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." 403 U.S. at 388. But subsequent to its decision in *Bivens*, the court has rejected, albeit in a different context, the artificial distinction between personal and property rights. Lynch v. Household Finance Corporation, 405 U.S. 538, at 552, 92 S.Ct. 113, 31 L.Ed.2d 424 (1972) (see quotation supra). In *Lynch* the court allowed suit in federal court

---

7. Title 28 U.S.C. § 1331(a) provides:
   "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

8. Damage actions against federal officials for alleged violations of Fifth Amendment rights have been recognized by at least two courts in the wake of *Bivens*: Moore v. Koelzer, 457 F.2d 892 (3rd Cir. 1972); Butler v. United States, 365 F.Supp. 1035 (D.Hawaii 1973).

under 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3) for the alleged deprivation of property pursuant to state law in violation of the equal protection and due process clauses of the Fourteenth Amendment. To permit a party to sue for the alleged deprivation of his property without due process of law by persons acting under color of state law and not permit a suit for damages against a federal officer for identical acts in violation of the identical provision in the Fifth Amendment can only be justified, if at all, by the fact that Congress specifically recognized the potential liability of state officers for their allegedly unconstitutional acts in 42 U.S.C. § 1983. But, in light of the court's decision in *Bivens*, the fact that Congress has not specifically recognized a cause of action for damages against federal officers is no longer an obstacle preventing federal courts from fashioning a damage remedy, where appropriate, directly from the Constitution.[9] As Justice Harlan stated in his concurring opinion in *Bivens*,

"Initially, I note that it would be at least anomalous to conclude that the federal judiciary—while competent to choose among the range of traditional judicial remedies to implement statutory and common law policies, and even to generate substantive rules governing primary behavior in furtherance of broadly formulated policies articulated by statute or Constitution . . . is powerless to accord a damage remedy to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of the popular will." 403–404.

Justice Harlan also stated:

"[T]he Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities; at the very least, it strikes me as no more appropriate to await express congressional authorization of traditional judicial relief with regard to these legal interests than with respect to interests protected by federal statutes."

Assuming the truth of plaintiff's allegations, government officers, under the cloak of federal statutory authorization vested in them, have deprived plaintiff of his property in violation of the Constitution resulting in considerable damages as a consequence. The necessity and appropriateness of judicial relief is no less compelling in this case than it was in *Bivens*. As in *Bivens*: A common law or state tort remedy may or may not afford a means of redressing this wrong, but in any case, will not be tailored specifically to cases of lawlessness pursuant to federal authority; the claim presented is obviously appropriate for money damages; and other remedies such as injunctive or relief in the nature of mandamus are no longer viable alternatives.

---

**9.** Also worthy of mention is the case of Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed.2d 142 (1933). The Supreme Court was there faced with the question of whether in a suit under the Tucker Act claimants were entitled to interest on their damage award occasioned by the construction of a dam by the government. In holding that interest on the claim must be paid the court stated:

"The suits were based on the right to recover just compensation for property taken by the United States for public use in the exercise of its power of eminent domain. The right was guaranteed by the Constitution. The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. Such a promise was implied because of the duty to pay imposed by the amendment. The suits were thus founded upon the Constitution of the United States."

Also of interest is the early case of Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1885) in which the court recognized the interrelationship between the Fourth Amendment and the self incrimination provision of the Fifth Amendment.

## V

What we have said thus far answers defendants' contention that the District Court did not have subject matter jurisdiction to hear this case by reason of 19 U.S.C. § 1618.[10] For even accepting the argument that the District Court cannot entertain jurisdiction to review the decision of the Secretary of the Treasury in granting a petition for remission or mitigation, this is not the issue presented. As has been pointed out, the complaint in this case concerns the defendant's failure to abide by 19 U.S.C. §§ 1602, 1603, 1604 and 1610 so as to have to the legality of the seizure considered by a court of law. It is true that prior to filing suit plaintiff filed two petitions for mitigation or remission, but these were never acted upon and the decision, or lack thereof, on these petitions was never an issue. In its complaint plaintiff merely asked that the court order defendants to institute forfeiture proceedings or return its goods and pay damages caused by the delay.

## VI

A remaining issue, presented by the defendants as an alternative basis for affirming the District Court, is that the doctrine of immunity would shield them from suit. This defense was not considered by the District Court, and plaintiff has not responded to it here. In addition, the record now before us is wholly inadequate to resolve such an issue. It is, of course, possible that the doctrine of official immunity as developed in cases such as Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); Spalding v. Vilas, 161 U.S. 483, 16 S.Ct.

631, 40 L.Ed. 780 (1896); and Norton v. McShane, 332 F.2d 855 (5th Cir. 1964), cert. denied, 380 U.S. 981, 85 S. Ct. 1345, 14 L.Ed.2d 274 (1965) will be applicable as a defense to the high ranking executive officers plaintiff has chosen to sue. But such immunity is not absolute, and its application must await further factual development of this case.

In the recent case of Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, 42 U.S.L.W. 4543 (U.S. Apr. 16, 1974), the Supreme Court considered the application of the defense of official immunity for executive officers in the context of damage suits brought by the personal representatives of the estates of three students killed at Kent State University in May, 1970. The named defendants, who were alleged to have deprived the students of their lives and rights in violation of the Constitution, were the then Governor of Ohio, the President of Kent State University, and the Adjutant-General and various unnamed members of the Ohio National Guard. The District Court had dismissed the complaints without requiring an answer on the basis that they were in substance and effect against the State of Ohio and as such barred by the Eleventh Amendment. The Court of Appeals affirmed on this basis and alternatively on the theory that the doctrine of absolute executive immunity barred the suits as against the named defendants. The Supreme Court rejected both bases for dismissing the suit and of particular interest to the case at bar is the court's discussion of the doctrine of immunity.

The court held that official immunity for executive officers is qualified and dependent upon the discretion and responsibility of the individual officer as

---

10. This statute provides:

"Whenever any person interested in any vessel, vehicle, merchandise, or baggage seized under the provisions of this chapter, or who has incurred, or is alleged to have incurred, any fine or penalty thereunder, files with the Secretary of the Treasury if under the customs laws or under the navigation laws, before the sale of

such vessel, vehicle, merchandise, or baggage a petition for the remission or mitigation of such fine, penalty, or forfeiture, the Secretary of the Treasury, . . . may remit or mitigate the same upon such terms and conditions as he deems reasonable and just, or order discontinuance of any prosecution relating thereto.

viewed in relation to the act in question. The court quoted the following passage from Mr. Justice Harlan's opinion in Barr v. Matteo, supra:

> " 'To be sure, the occasions upon which the acts of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted—the relation of the act complained of 'to matters committed by law to his control or supervision,' Spalding v. Vilas, *supra*, at 498 [16 S.Ct. 631]—which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits.' 360 U.S., at 573–574 [79 S.Ct. at 1340]"

And the court then stated:

> "These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith

belief, that affords basis for qualified immunity of executive officers for acts performed in the course of official conduct." 42 U.S.L.W. 4548 [94 S.Ct. 1692].

Because of the absence of a factual record the court was unable to determine whether the named defendants should have been dismissed on the basis of official immunity, and the case was accordingly remanded.

Although *Scheuer* involved a suit against state executive officers, the court's discussion of the qualified nature of executive immunity would appear to be equally applicable to federal executive officers.[11] But as in *Scheuer*, the lack of factual development in the trial court makes it impossible for this court to determine whether one or more of the named defendants should be dismissed from this suit on the basis of executive immunity. On remand of this case, the parties will have the opportunity to develop the facts showing the relationship of the defendants to the allegedly illegal detention of goods in light of the discussion in *Scheuer*.[12] Plaintiff should also be afforded the opportunity to amend its complaint to add or subtract named defendants. We also note that 28 U.S.C. § 2006 and 28 U.S.C. § 2465 may be relevant to the application of the doctrine of official immunity in this case.

Accordingly, for the reasons stated, the dismissal order of the District Court is vacated and this case is remanded for further proceedings consistent with this opinion.

Vacated and remanded.

---

11. This is indicated by the court's quotation from Barr v. Matteo which was a libel suit against a federal executive officer, the Acting Director of the Office of Rent Stabilization.

12. As in *Scheuer*, we are confronted with the immunity question in the context of a constitutional claim. We are not here dealing with the question of absolute immunity as to a claim that has no constitutional foundation.