**BERLIN DEMOCRATIC CLUB et al., Plaintiffs,**

v.

**Donald H. RUMSFELD\* et al., Defendants.**

Civ. A. No. 310–74.

United States District Court, District of Columbia.

March 17, 1976.

---

\* As successor in office to James R. Schlesinger, Mr. Rumsfeld is automatically substituted as defendant pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure.

John H. F. Shattuck, Melvin L. Wulf, American Civil Liberties Union, New York City, David F. Addlestone, Lawyers Military Defense Committee, Washington, D. C., for plaintiffs.

Earl J. Silbert, U. S. Atty., Royce C. Lamberth, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

WILLIAM B. JONES, Chief Judge.

### INTRODUCTION

This is an action by a number of American citizens and organizations and one Austrian citizen, residing in West Berlin or the Federal Republic of Germany [FRG], who challenge certain of the United States Army's intelligence activities. The plaintiffs are the Berlin Democratic Club [BDC], which among other activities supported Senator McGovern for president in 1972 and the impeachment proceedings against former President Nixon in 1973; the Lawyers Military Defense Committee [LMDC], which operates as a legal aid service for members of the armed forces overseas; present and former members of the BDC; attorneys and consultants to the LMDC; American writers and journalists; an Austrian journalist who has acted as a consultant to the LMDC; and two American ministers formerly residing at Gossner Mission in Mainz, West Germany. The defendants are myriad Department of Defense Army officials and uniformed personnel allegedly responsible for or instrumental in conducting the intelligence program as it has been carried out in West Berlin and in the Federal Republic of Germany.

Plaintiffs allege numerous acts of warrantless electronic surveillance; covert infiltration of BDC meetings; covert infiltration of the Gossner Mission for the purpose of disrupting the Mission's counseling activities and provoking Mission personnel to commit illegal acts; covert infiltration of English language journals, for which several plaintiffs work, for the purpose of disrupting their journalistic activities and provoking the journalists to commit illegal acts; deliberate disruption of the counseling activities of the Austrian journalist; maintenance of "dissidence identification" files and "blacklists"; dissemination of these files to military and civilian agencies and private citizens, resulting in the dismissal of two plaintiffs from jobs at the United States exhibit at the German Industrial Fair, termination of two jobs held by another plaintiff at the British supply depot in West Berlin and with a private landscaping firm in West Berlin, debarment of another plaintiff from access to all United States military installations in Berlin, institution of deportation proceedings against another plaintiff by the German authorities, the inability of several other plaintiffs to obtain security clearances for jobs they were seeking,

damage to the professional reputations of the LMDC, its lawyers, and the American journalists; and illegal opening of plaintiffs' mail either by American authorities or by German authorities at the inducement of defendants. Plaintiffs claim that these activities as alleged violate their first, fourth, fifth, sixth and ninth amendment rights as well as their statutory rights. They seek injunctive, declaratory, and monetary relief for violation of their statutory and constitutional rights.

## PROCEDURAL HISTORY

Plaintiffs filed their original complaint on February 19, 1974, and shortly thereafter initiated certain discovery requests. On May 24, 1974, defendants obtained a protective order suspending discovery until disposition of their motion to dismiss, which they intended to file shortly.

They moved for summary judgment, rather than for dismissal, on June 7, 1974, which plaintiffs opposed on August 6, 1974. Plaintiffs also moved to file an amended complaint, and for class action certification on the same date. On October 29, 1974, defendants filed a renewed motion for summary judgment, after it became apparent that certain of the factual representations made by defendants in their initial motion had been inaccurate. The renewed motion also raised a new ground for summary judgment, based upon a new regulation promulgated by the Army in September, 1974, which defendants claim moots the injunctive relief requested by plaintiffs. Plaintiffs opposed this renewed motion on December 10, 1974.

On February 3, 1975, plaintiffs moved to dissolve the protective order, and in support thereof proffered documents to the Court tending to show that the Army was not, in fact, abiding by its new regulations. Defendants opposed this motion on February 20, 1975. After the resolution of some minor procedural matters dealing with submission and dissemination of certain military documents, which ended in a stipulation approved by the Court on October 2, 1975,

the defendants' motion for summary judgment and plaintiffs' motions to file the amended complaint, for class action certification, and to dissolve the protective order are now before the Court. A hearing was held February 23, 1976 on all pending motions.

Defendants have raised a series of threshold issues: amount in controversy, justiciability, personal jurisdiction over certain defendants, standing to sue of the Austrian journalist, mootness, and whether the first and sixth amendments provide plaintiffs with a cause of action for damages. Also ripe for decision is the purely legal question whether the Army may institute electronic surveillance against American citizens abroad for national security reasons.

## AMOUNT IN CONTROVERSY

Plaintiffs allege jurisdiction pursuant to 28 U.S.C. § 1331, among other statutes. Of course, each plaintiff must have $10,000 in controversy, and the plaintiffs bear the burden of proof. *Gomez v. Wilson*, 155 U.S.App.D.C. 242, 477 F.2d 411, 419–20 (1973). That burden is slight, however, since the Court can dismiss the complaint only if it is satisfied to a legal certainty that each plaintiff is not entitled to the $10,000 minimum. *St. Paul Indemnity Co. v. Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845, 848 (1938).

Such is not the case here. All the plaintiffs allege their telephones have been wiretapped, their meetings and private associations infiltrated, and their daily activities disrupted by the defendants. They further allege that the Army has disseminated derogatory information about each of them either leading to termination or restriction of employment opportunities, or severely restricting their activities for fear of causing further dissemination. At this stage of the litigation it cannot be said to a legal certainty that compensatory damages of at least $10,000 are impossible, or that punitive damages are inappropriate. Therefore, defendants' argument is with-

out merit at this stage of the litigation and in the absence of discovery.

## JUSTICIABILITY

Defendants rely heavily upon *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1973), in arguing that the plaintiffs have not presented a justiciable controversy. In *Tatum*, a group of civilians complained that the intelligence gathering and dissemination activities of the Army in the United States chilled them in the exercise of their first amendment rights.[1] The Court described the surveillance system as follows:

> The system put into operation as a result of the Army's 1967 experience consisted essentially of the collection of information about public activities that were thought to have at least some potential for civil disorder, the reporting of that information to Army Intelligence headquarters at Fort Holabird, Maryland, the dissemination of these reports from headquarters to major Army posts around the country, and the storage of the reported information in a computer data bank located at Fort Holabird. The information itself was collected by a variety of means, but it is significant that the principal sources of information were the news media and publications in general circulation. Some of the information came from Army Intelligence agents who attended meetings that were open to the public and who wrote field reports describing the meetings, giving such data as the name of the sponsoring organization, the identity of speakers, the approximate number of persons in attendance, and an indication of whether any disorder occurred. And still other information was provided to the Army by civilian law enforcement agencies.

408 U.S. at 6, 92 S.Ct. at 2322, 33 L.Ed.2d at 159. It was clear that there was "no evidence of illegal or unlawful surveillance activities"; there was no "clandestine intrusion by a military agent." 408 U.S. at 9, 92 S.Ct. at 2323, 33 L.Ed.2d at 161; quoting from 144 U.S.App.D.C. 72, at 78, 444 F.2d 947, at 953. Nothing detrimental had been done to the plaintiffs, nor was anything detrimental contemplated. *Id.* The only challenged action was the existence of the intelligence gathering and disseminating system. To allege that this chilled first amendment rights, according to the Court, was "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." 408 U.S. at 14, 92 S.Ct. at 2326, 33 L.Ed.2d at 164.

■ *Tatum* is readily distinguishable from the instant case. All of the plaintiffs alleged purposeful dissemination of intelligence information resulting in termination or restriction of employment opportunities, unfair military trials, or damaged reputations. Plaintiffs further allege that their phones have been illegally wiretapped and their activities have deliberately and intentionally been disrupted by infiltrators who either provided them false information or entreated them to illegal action. Certain plaintiffs complain that they have been barred from access to U.S. military facilities, have lost their jobs, or have been denied employment because of the dissemination. One plaintiff alleges that the German authorities were induced by American officials to institute deportation proceedings against her. None of these actions were part of the intelligence gathering system challenged in *Tatum*. Such actions clearly are justiciable.

Defendants contend that persons subjected to the Army's surveillance activities cannot challenge the surveillance activities after *Laird v. Tatum*. Instead, they are limited to challenging "other and additional action" arising out of the surveillance activities. Thus, for example, if information gathered by an undercover agent was later used as grounds

---

1. Of course, *Tatum* bears only on plaintiffs' first amendment cause of action, not their fourth, sixth, or ninth amendment, or statutory causes of action.

for dismissal from employment of the person surveilled, the defendants would limit that person's challenge to the use of the information to terminate his employment, foreclosing inquiry into the basis for the original surveillance. There is a certain appeal to defendants' argument, and clearly a basis in *Laird v. Tatum* for its adoption. The Court stated in strong terms that it is not the office of the judiciary to scrutinize the breadth of the Army's intelligence activities:

> Stripped to its essentials, what respondents appear to be seeking is a broad-scale investigation, conducted by themselves as private parties armed with the subpoena power of a federal district court and the power of cross-examination, to probe into the Army's intelligence-gathering activities, with the district court determining at the conclusion of that investigation the extent to which those activities may or may not be appropriate to the Army's mission. The following excerpt from the opinion of the Court of Appeals suggests the broad sweep implicit in its holding:
>
> "Apparently in the judgment of the civilian head of the Army not everything being done in the operation of this intelligence system was necessary to the performance of the military mission. *If the Secretary of the Army can formulate and implement such judgment based on facts within his Departmental knowledge, the United States District Court can hear evidence, ascertain the facts, and decide what, if any, further restrictions on the complained-of activities are called for* to confine the military to their legitimate sphere of activity and to protect [respondent's] allegedly infringed constitutional rights." 144 U.S.App.D.C. at 83, 444 F.2d, at 958. (Emphasis added.)

Carried to its logical end, this approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the "power of the purse"; it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action.

> We, of course, intimate no view with respect to the propriety or desirability, from a policy standpoint, of the challenged activities of the Department of the Army; our conclusion is a narrow one, namely, that on this record the respondents have not presented a case for resolution by the courts.

408 U.S. at 14–15, 92 S.Ct. at 2326, 33 L.Ed.2d at 164.

 To limit the inquiry to "other and additional action," however, would be too restrictive, for the surveillance activity itself can be unlawful or illegitimate. A surveillance operation of the sort described in *Laird v. Tatum* is simply foreclosed from inquiry. See *Fifth Avenue Peace Parade Committee v. Gray*, 480 F.2d 326, 332–33 (2d Cir. 1973); *Socialists Workers Party v. Attorney General*, 510 F.2d 253 (2d Cir. 1974). A surveillance operation which utilizes tactics beyond those alleged in *Laird v. Tatum* and illegitimate or unlawful in themselves, however, is justiciable. For example, in *Handschu v. Special Services Division*, 349 F.Supp. 766 (S.D.N.Y.1972), allegations similar in certain respects to those presented here were discussed in light of *Laird v. Tatum*, and were found justiciable:

> Plaintiffs' challenge here is not to the use of informers and undercover agents as such, but to conduct of SIS and its agents that allegedly exceeds permissible limits and goes far beyond legitimate surveillance activities with the intent and purpose to invade their constitutional right of free association and communication.

349 F.Supp. at 770. And in *Philadelphia Yearly Meeting of The Religious Society of Friends v. Tate*, 519 F.2d 1335 (3d Cir. 1975), the court distinguished between mere photographing, data gathering at public meetings, and sharing of such information with other law enforcement

agencies, which could not be challenged, and dissemination of such information to non-police groups or individuals and the press, which could be challenged. The court stated:

> It is not apparent how making information concerning the lawful activities of plaintiffs available to non-police groups or individuals could be considered government activity, particularly since it is alleged that plaintiffs are subject to surveillance *only* because their political views deviate from those of the "establishment." We think these allegations, at a minimum, show immediately threatened injury to plaintiffs by way of a chilling of their rights of freedom of speech and associational privacy.

519 F.2d at 1338. This Court agrees that actions beyond "legitimate surveillance activities" are a proper subject of challenge. Thus, while collection and retention of information, if collected in a legal manner, cannot be challenged, public dissemination of that information in a false or defamatory manner and with no lawful purpose, disruption of legitimate activities, termination of employment, illegal electronic surveillance, and other forms of harassment are subject to challenge as beyond "legitimate surveillance activities." Moreover, even legitimate surveillance activities, if undertaken in conjunction with illegitimate activities in a manner which raises the inference that the motive was intimidation or coercion, would be subject to challenge. *Cf. Allee v. Medrano,* 416 U.S. 802, 812, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566, 578 (1974); *United States v. McLeod,* 385 F.2d 734, 750 (5th Cir. 1967); *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1966). Even a cursory reading of the acts alleged in the complaint raises a sufficient inference to render this action justiciable.

### PERSONAL JURISDICTION

■ Defendants allege that the Court lacks personal jurisdiction over five of the twenty-four named defendants. All five are sued in their individual capacities. Four of these defendants reside overseas and were served by mail pursuant to the D. C. Long Arm Statute, D.C. Code §§ 13–422, 423; one resides in Virginia and was personally served at his residence.

Plaintiffs argue that personal jurisdiction exists under the conspiracy theory, recently reiterated in *Mandelkorn v. Patrick,* 359 F.Supp. 692 (D.D.C.1973). There, Judge Robinson held that the acts of one co-conspirator, if done within the District, in furtherance of the conspiracy, and resulting in injury in the District, will satisfy personal jurisdiction over non-resident co-conspirators. 359 F.Supp. at 696. It does not matter that plaintiffs allege other injuries as well as those suffered in the District, or that the co-conspirator acting in the District was not a senior partner, as defendants would require.

Here, plaintiffs allege that the activities of the LMDC, which has an office in the District, were injured by the dissemination of defamatory reports concerning their attitudes as defense counsel. Moreover, plaintiffs allege that telephone conversations between the German and District LMDC offices were curtailed because of electronic surveillance. Thus, injury within the District is alleged. Further, plaintiffs allege that these defendants were acting pursuant to orders from the superiors in Washington, who are defendants in this action and alleged co-conspirators.

While it would be improper to now hold that personal jurisdiction exists over these defendants, it would be equally improper to hold that there is no personal jurisdiction in the absence of discovery. As plaintiffs' counsel stated at the February 23 hearing, plaintiffs have had no opportunity to establish factually from whence the orders emanated, the contacts between the domestic and overseas defendants, location of the "dissident identification" files and "blacklists," and other data relevant to the question of personal jurisdiction. This question will therefore be reserved pending discovery by plaintiffs and a subsequent motion by defendants if warranted.

## STANDING

Defendants argue that plaintiff Tomi Schwaetzer, an Austrian citizen alleging illegal wiretapping and intentional disruption of his activities by the Army, is without standing to sue. Defendants rely on the general rule that non-resident aliens have no standing to sue in United States courts. See *Johnson v. Eisentrager*, 339 U.S. 763, 776, 70 S.Ct. 936, 942, 94 L.Ed. 1255, 1265 (1950); *Reyes v. Secretary of Health, Education and Welfare*, 155 U.S.App.D.C. 154, 476 F.2d 910, 915 n.8 (1973); *Kukatush Mining Corp. v. SEC*, 114 U.S.App.D.C. 27, 309 F.2d 647, 649–50 (1962); *cf. Kleindienst v. Mandel*, 408 U.S. 753, 771, 92 S.Ct. 2576, 2586, 33 L.Ed.2d 683, 696 (1972) (Douglas, J., dissenting). The exceptions to this rule, which permit a non-resident alien to sue where the *res* is in the United States or where a specific statutory scheme permits suits by non-resident aliens for injuries suffered under the statute,[2] are inapplicable here. See *Constructores Civiles de Centroamerica, S. A. v. Hannah*, 148 U.S.App.D.C. 159, 459 F.2d 1183, 1190 (1972).

Plaintiffs rely heavily on a "trend" in the federal courts permitting non-resident aliens to sue for actions directed at them by United States officials which are violative of the Constitution. The "trend" is embodied in one case, *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), which held that non-resident aliens have standing to challenge unconstitutional action abroad, "at least where the government seeks to exploit the fruits of its unlawful conduct in a criminal proceeding against the alien in the United States." 500 F.2d at 280. While *Toscanino* definitely signals a trend toward liberalizing the general rule, the court's caveat makes clear that it is simply another exception to that. Thus, after *Toscanino*, a non-resident alien who is seized abroad in order to secure his presence for a domestic prosecution, may challenge the constitutionality of his seizure.

The question before the Court, therefore, is whether still another exception to the general rule should be carved for the instant situation. In the instant case, it should be noted that a fact common to all other recognized exceptions is not present here. Where the *res* at issue is within a domestic court's jurisdiction, or when a non-resident alien makes application for relief under a United States statute which permits granting the requested relief to non-resident aliens, or when a non-resident alien is brought from abroad to appear for and be the subject of a domestic criminal prosecution, there are different expectations of treatment than when a non-resident alien is simply affected by United States officials abroad. In the former instances, the United States has the power to, or has in fact imposed the framework of its government process on the non-resident alien. The United States is the only entity with power over the res, it is the entity requiring an applicant to follow a prescribed statutory process, or it is the entity attempting to render justice regarding the non-resident alien in a domestic court. In each of these cases, the non-resident alien should be entitled to the advantages of the legal process with which he is forced to deal. When the non-resident alien does not make application under a statute to the United States for certain action, or is not subjected to its courts, but is harmed in his own country, he cannot and should not expect entitlement to the advantages of a United States court. As noted in *Johnson v. Eisentrager, supra*, the rationale for permitting a resident alien access to United States courts is "an implied assurance of safe conduct" in this country. 339 U.S. at 770, 70 S.Ct. at 939, 94 L.Ed. at 1261. See also *Balzac v. Porto Rico*, 258 U.S. 298, 312, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1921) (the Constitution is in force where the *sovereign* power of the United States

---

2. The only statutes under which plaintiffs proceed do not support a cause of action. See discussion *infra*.

is asserted). No similar assurance is or need be given to a citizen of a foreign country, who is not subjected to the laws of this country and who can utilize the laws of his own country to protect himself.

 Schwaetzer has no contact with the United States other than his meetings abroad with private United States citizens and his alleged electronic surveillance by United States Army personnel. He has not been thrust into American courts, or denied application for a benefit which a United States statute provides him. His lack of contact with the American legal system minimizes any expectation or hope that he could utilize that legal system for his protection. He must be dismissed as a plaintiff for lack of standing.

## MOOTNESS

Defendants also argue that AR 381–17 and AR 380–13, promulgated in September 1974, have mooted any claim plaintiffs might otherwise have for injunctive relief. Neither regulation, however, can provide a basis for denial of injunctive relief.

 First, AR 381–17, as will be discussed in the next section, does not and never has provided for prior judicial authorization of wiretaps, which plaintiffs contend the fourth amendment requires. Thus, plaintiffs' fourth amendment claims for injunctive relief are not mooted.

 Nor does AR 380–13 as amended moot the remainder of plaintiffs' claims for injunctive relief. As noted earlier, the allegations of abusive dissemination of information, illegal disruption of activities, etc., not permitted by AR 380–13, present a justiciable controversy under the first amendment. Defendants contend they "are confident" that abusive surveillance techniques and dissemination of information as alleged by plaintiffs will not be repeated. Def. Supp.Mem. at 5, 8–9. Moreover, they assert by affidavit that no investigations of non-DOD-affiliated citizens are pres-

ently being conducted. Def. Exhibit 36–F. Plaintiffs should be granted discovery to contravene these assertions, which are clearly contrary to the allegations in plaintiffs' complaint, factually suspect in light of the earlier admitted misrepresentations to the Court, and in fact questioned by at least one Army action undertaken since promulgation of revised AR 380–13. See Pl's Exhibit CC. Moreover, the pattern of action alleged in the complaint alone is sufficient to reject defendants' mootness argument. As the Court of Appeals noted in *Watkins v. Washington*, 153 U.S.App.D.C. 298, 472 F.2d 1373 (1972), when faced with a comparable argument in a racial discrimination case:

> Where pervasive racial discrimination is demonstrated, the court has not only the power, but also the duty, to render a decree eliminating the effects of past discrimination and ensuring equal opportunity in the future. *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). That there is a new Director of the Housing Division who has taken steps to ensure equal employment opportunity does not justify denying affirmative equitable relief. The period of nondiscrimination since 1968 is very brief compared to the long record of discrimination demonstrated in this case, and even if the new supervisors are entirely in good faith the task of eliminating ingrained discriminatory practices is a difficult one deserving of active judicial support. [cites omitted]

153 U.S.App.D.C. 298, 472 F.2d at 1376. Defendants' argument must therefore be rejected.

## FOURTH AMENDMENT

 Plaintiffs allege that the defendants' activities, as described in the complaint, violate their rights under the fourth amendment to be free of unreasonable searches and seizures. The only activity of defendants which could support a fourth amendment violation is electronic surveillance, since it is well settled that mere penetration of plain-

tiffs' organizations, whether covert or overt, does not violate fourth amendment rights. See *Hoffa v. United States*, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374, 387 (1966); *United States v. White*, 401 U.S. 745, 749, 91 S.Ct. 1122, 1124, 28 L.Ed.2d 453, 457 (1971). Plaintiffs claim that the surveillance contravened the fourth amendment in that it was not pursuant to prior judicial authorization. Plaintiffs also ask the Court to enjoin future electronic surveillance unless prior judicial approval is obtained.

Defendants argue that for several reasons plaintiffs' complaint fails to state a claim upon which relief can be granted under the fourth amendment. In their first Motion to Dismiss, defendants urge (1) that the fourth amendment is inapplicable to electronic surveillance in the FRG because United States officials do not participate in the actual surveillance; (2) that even if applicable, the fourth amendment does not require prior judicial approval of wiretap suggestions,[3] proffering several considerations which according to defendants render the present procedure "reasonable"; and (3) that the unique situation in West Berlin negates the necessity or advisability for prior judicial authorization of electronic surveillance carried out by United States officials there. The first argument requires treatment before reaching the question of prior judicial authorization.

### (1) Procedure for Electronic Surveillance in the FRG

■ Defendants correctly state that acts of a foreign government within its own territory against United States citizens are not subject to the limitations of the fourth amendment. See *Stonehill v. United States*, 405 F.2d 738, 743 (9th Cir.

1968). The fourth amendment does apply to actions by foreign officials if United States officials participated in those actions "so as to convert them into joint ventures between the United States and the foreign officials." 405 F.2d at 743; see *Powell v. Zuckert*, 125 U.S.App.D.C. 55, 366 F.2d 634, 640 (1966); *Birdsell v. United States*, 346 F.2d 775, 782 (5th Cir. 1965).

■ Defendants contend that the G–10 Law of the FRG precludes the type of substantial participation which must be shown before the fourth amendment becomes applicable. The problem with defendants' argument is that it simply misses the point of plaintiffs' complaint. To be sure, this Court is without authority to control the actions of FRG officials in discharge of their duties under the G–10 Law. See *Holmes v. Laird*, 148 U.S.App.D.C. 187, 459 F.2d 1211, 1218 (1972).[4] If the actions of the FRG officials, in carrying out "suggested" wiretaps on behalf of the United States Army, are such that a "suggestion" can effectively be equated with institution of a wiretap, then the plaintiffs' constitutional rights are in effect being violated by United States officials. In such circumstances, a warrant requirement should be imposed. See discussion *infra*. That such might be the case is revealed by the defendants' own description of the operation of the G–10 Law and the NATO SOFA:

Article 10 of the Basic Law of West Germany, appended as Appendix C, provides that the right to secrecy of mail, post and telecommunications shall be inviolable and may only be restricted pursuant to law. The G–10 Law authorizes carefully circumscribed restrictions on that right. One of the principal purposes of these restrictions

---

**3.** As will be explained infra, the role of the United States in electronic surveillance in the FRG is limited to making "suggestions" to FRG officials to undertake electronic surveillance of a subject.

**4.** In *Stonehill* and *Birdsell*, the requested relief was not an injunction, but suppression of evi-

dence in a criminal trial. Such relief could be afforded by the courts, and therefore they entered into the inquiry of the extent of participation of United States officials, to determine if the policy of the exclusionary rule required suppression.

noted in the G–10 Law is the need to avert dangers that threaten the security of the foreign North Atlantic Treaty Organization (NATO) forces in the Federal Republic. G–10 Law, art. 1, § 1, ¶ (1). Furthermore, one of the explicit grounds for authorizing an intercept is "if there are factual clues to support a suspicion that a person plans, commits, or has committed . . . offenses against the security of the forces of the non-German Contracting States of [NATO] stationed in the [FRG] . . . ." Id., art. 1, § 2, ¶ (1)5. Article 7 of the Fourth Amending Law to the German Criminal Code makes it criminal to engage in acts of subversion against NATO forces stationed in the Federal Republic. See Defendants' Exhibit 12.

The FRG's legislatively expressed concern for the security of foreign NATO forces stationed in West Germany derives from its obligation under the Status of Forces Agreement (SOFA) to adopt legislation to protect allied security and protective interests. NATO SOFA, art. VII, ¶ 11. The Supplementary Agreements to the NATO SOFA go even further in implementing this obligation by specifying the types of security and protective interests against which the legislation is intended to guard, such as desertion, sabotage, subversion, and disclosure of military secrets. NATO SOFA Supplementary Agreements, art. 29, ¶¶ 1, 2. In addition, the Supplementary Agreements bind each of the allied signatories to "cooperate closely" to implement the SOFA, "to render mutual assistance," and specifically, insofar as security and protection of the forces are concerned, to extend their cooperation "especially to the collection, exchange, and protection of all information which is of significance for these purposes." Id., art. 3, ¶¶ 1, 2(a).

Pursuant to these international agreements, and as a means of honoring them, the FRG has made it possible for Allied powers whose NATO forces are stationed in Germany to avail themselves of the procedures of the G–10 Law (i) by authorizing the Allied forces to submit suggestions for intercepts to FRG authorities for consideration under West German law, and (ii) in the event interception is approved and conducted by the German government in accordance with the law, by sharing with the suggestor the information obtained. See Defendants' Exhibit 2, ¶¶ F. 6 & 7, and the press statement of the German Government issued on August 2, 1973, and attached to Defendants' Exhibit 16. . . .

Def. First Motion to Dismiss, at 59–61. This description raises at least the inference that the FRG acts under the G–10 Law and the NATO SOFA as an "electronic surveillance arm" of visiting military commands. Plaintiffs are entitled to discovery of facts which would demonstrate that the FRG simply carries out the suggestions of the United States Army without meaningful review. Of course, if defendants can demonstrate factually that United States "suggestions" have been rigorously reviewed and perhaps rejected by FRG officials on certain occasions, there may not in fact by any search by United States officials, and therefore the fourth amendment would be inapplicable.

In the absence of such a factual showing, however, in order to reject defendants' arguments at this stage of the proceedings, it is enough to quote the words of the Supreme Court in *Reid v. Covert*, 354 U.S. 1, 16, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148, 1163 (1957):

> No agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.

See *Holmes v. Laird*, 148 U.S.App.D.C. 187, 459 F.2d 1211, 1217 (1972); *Powell v. Zuckert*, 366 F.2d 634, 640 (D.C. Cir. 1966).

### (2) *The Warrant Requirement*

The Court realizes that decision of the novel and critical question presented

here will in effect grant a portion of the final relief requested in the complaint. The procedural posture of the case, however, requires its decision at this time. Defendants have argued that no prior judicial authorization is required in support of their contention that plaintiffs have not stated a claim under the fourth amendment on which relief can be granted. To dispose completely of defendants' pending motions so as to enable plaintiffs to proceed, the issue must be decided. Ordinarily, decision of such an issue would be followed by issuance of an injunction carrying out the basis of the decision. In the instant case, however, plaintiffs have not moved for preliminary injunction pursuant to Rule 65, F.R.C.P., and the Court is of the opinion that an injunction should not be issued until such a motion is made. If plaintiffs are so disposed, therefore, the Court will entertain a motion for a preliminary injunction based upon this Memorandum.

Prior to defendants' first motion for summary judgment, electronic surveillance activities overseas were governed by DA Message 262311Z July 73. That message set forth interim guidelines for wiretapping, and provided in pertinent part:

7. Wiretap, investigative monitoring and eavesdrop activities by or for Department of the Army worldwide are prohibited unless:

A. There are reasonable grounds to believe that a criminal offense concerning national security is involved or that a felony has been or is about to be committed or telephone calls involving obscenity, harassment, extortion, bribery, or threat of bodily harm have been made to a subscriber-user on a military installation under the jurisdiction of the department of the army and

B. Advance approval has been obtained from appropriate authority as specified in paragraph 8, A thru D below.

. . . . .

8. Approval of wiretaps, investigative Monitoring and Eavesdrops.

. . . .

B. OCONUS: All wiretaps, investigative monitoring and eavesdrop activities conducted by or for the department of the Army outside those areas defined in paragraph 8, A above, must be approved in advance as follows:

(1) For counterintelligence operations and security investigations, by either the commander-in-chief, U. S. Army Europe, . . . The responsibility may be delegated within each headquarters concerned to the primary intelligence officer.

. . . . .

Def. Exh. 33. After defendants' original motion to dismiss but prior to their renewed motion, the Army promulgated new AR 381–17 in DA Message 021847Z Aug. 74, which essentially reiterated the standards of ¶ 7A of DA Message 262311Z July 73, adding two other requirements for wiretap approvals:

(2) There are reasonable grounds to believe that particular communications concerning that offense will be obtained through such interception, and

(3) Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. Def. Exh. 36–A. DA Message 192229Z Sep. 74, which amended AR 381–17, ordered that electronic surveillance "not be directed against US citizens not affiliated with DOD OCONUS unless specifically authorized by the Secretary or the Under Secretary of the Army." Def. Exh. 36–B. Such approval is required even if the surveillance is foreign intelligence gathering. DA Message 101902Z Oct. 74. Def. Exh. 49. Thus, while the standards and authority for wiretap approval have changed, at no time has prior judicial authorization been required.

The question is squarely presented: whether prior judicial authorization is required for electronic surveillance instituted by the Army on non-military

United States citizens living in the FRG[5] or Berlin. Analysis of *United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) [hereinafter *Keith*] and *Zweibon v. Mitchell*, 516 F.2d 594 (D.C. Cir. 1975) compels the conclusion that prior judicial authorization is constitutionally required.[6]

The Supreme Court in *Keith* was faced with a claim by the Executive Branch that no prior judicial authorization was required for installation of a wiretap against an American citizen where the purpose was "to gather intelligence information deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the Government." 407 U.S. at 300, 92 S.Ct. at 2128, 32 L.Ed.2d at 756. The Court noted at the outset that its holding would be limited, stating "the instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country. . . . There is no evidence of any involvement, directly or indirectly, of a foreign power." 407 U.S. at 308–09, 92 S.Ct. at 2132, 32 L.Ed.2d at 761. It then proceeded to analyze the competing interests. On the one hand, "unless Government safeguards its own capacity to function and to preserve the security of its people, society itself could become so disordered that all rights and liberties would be endangered." Competing with the need of self-preservation, the Court said, was the abuse of the capability of self-preservation. It pointed to "a deep

seated uneasiness and apprehension that this capability will be used to intrude upon cherished privacy of law-abiding citizens," and the historic "tendency of Government—however benevolent or benign its motives—to view with suspicion those who most fervently dispute its policies." The Court concluded:

> The price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power. Nor must the fear of unauthorized official eavesdropping deter vigorous citizen dissent and discussion of Government action in private conversation. For private dissent, no less than open public discourse, is essential to our free society.

407 U.S. at 312–14, 92 S.Ct. at 2135, 32 L.Ed.2d at 764.

The Court then turned to an analysis of the warrant requirement, and particularly the Government's argument that "special circumstances applicable to domestic security surveillance necessitate" an exception to the requirement. According to the Government, prior judicial approval would "obstruct the President in the discharge of his constitutional duty to protect domestic security"; national security surveillances "are not an attempt to gather evidence for specific criminal prosecutions"; the "large number of complex and subtle factors" placed a determination whether to approve a wiretap "beyond the competence of the courts to evaluate"; and finally, disclosure to a judge or magistrate would involve serious potential dangers of a breach of secrecy. 407 U.S. at 318–19, 92 S.Ct. at 2137, 32 L.Ed.2d at 767.

---

**5.** As noted earlier, the Army is not the party actually conducting electronic surveillance in the FRG. Under German law and the NATO Status of Forces Agreement (SOFA), the Army may only suggest to FRG authorities that electronic surveillance of an individual be conducted. The final decision is left to FRG authorities. In light of the Court's earlier conclusion that at this time it cannot be said that the Army is not engaged in a joint venture with the FRG through the provisions of these laws, reference to institution of electronic surveillance will include both Berlin wiretaps and FRG "suggestions" of wiretaps.

**6.** Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq., is inapplicable to electronic surveillance abroad. See *United States v. Toscanino*, 500 F.2d 267, 279–80 (2d Cir. 1974). Therefore, any claim advanced by plaintiffs must rest on the strictures of the fourth amendment. There is no question, of course, that the Constitution applies to actions by United States officials taken against American citizens overseas. See *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1954).

The Court, while giving these arguments "careful consideration," nonetheless found they do not justify abrogation of the warrant requirement: ·

> Official surveillance, whether its purpose be criminal investigation or ongoing intelligence gathering, risks infringement of constitutionally protected privacy of speech. Security surveillances are especially sensitive because of the inherent vagueness of the domestic security concept, the necessarily broad and continuing nature of intelligence gathering, and the temptation to utilize such surveillance to oversee political dissent. We recognize, as we have before, the constitutional basis of the President's domestic security role, but we think it must be exercised in a manner compatible with the Fourth Amendment. In this case we hold that this requires an appropriate prior warrant procedure.

407 U.S. at 320, 92 S.Ct. at 2138, 32 L.Ed.2d at 768.

As will be seen shortly, arguments almost identical to those made by the Government in *Keith* have been reiterated here. If it were not for the presence of certain distinguishing factors, it would be enough to rely on *Keith* in rejecting those arguments, since the victims of electronic surveillance in the instant case are—according to the pleadings—American citizens or organizations engaged in lawful political dissent. The delicate situation of the United States Army in Europe, however, requires careful attention to the Government's arguments advanced here.

At the outset it should be observed that the instant case involves significant foreign policy concerns which place it within that area reserved for decision by the Supreme Court by *Keith*. In *Zweibon v. Mitchell*, 516 F.2d 594 (D.C. Cir. 1975), this Circuit found that electronic surveillance of a domestic political organization engaged in activities which "involve[d] Russia in a confrontation with the United States" did "indeed involve the foreign affairs of this country and therefore falls outside the holding in *Keith* and into the area reserved for future disposition." 516 F.2d at 652; see also 516 F.2d at 612 n. 39. The Court of Appeals rejected the argument that collaboration with foreign powers or agents was required by *Keith* before the President could invoke his constitutional power to conduct foreign affairs. Collaboration, according to the *Zweibon* court, was used in *Keith* as "the most obvious example," not the sole determinant, of involvement in foreign affairs. The propriety of the court's rejection of such arbitrary lines is well illustrated by the instant case.

Plaintiffs argue that the *Keith* decision is directly applicable because "the defendants have offered no evidence whatever to indicate that there is or was the slightest connection (to say nothing of a 'significant connection') between any of the plaintiffs and 'a foreign power.'" Pl's First Mem. in Opp. at 97–98. As just noted, collaboration is not the sole determinant. Instead, where the activities of admittedly domestic organizations or individuals may affect directly and substantially the foreign relations of the United States, the *Keith* decision is no longer directly controlling. Such is the case here. First, the location of the Army in Europe means that disruptive or morale-reducing activities by political organizations will affect the attitudes of the host countries toward the United States. As General Bowen outlines in his affidavit, the Army's presence is of vital concern not only to the security of the United States, but also, and perhaps more directly, to the security of the Allied powers hosting the Army in Europe. Def. Exh. 2, ¶ C.1–4. The readiness, ca-

---

**7.** While the situation is not presented and the Court need not discuss its merits, for purposes of distinction it should be observed that the same arguments would not apply to criminal activity directed against Army units located in the United States by American citizens, where the security of another country is not so directly dependent upon the capability of the Army unit.

pability and effectiveness of the Army in Europe is truly a foreign relations concern.[7]

This is not to say that the Court should blind itself to the "domestic" aspects of the Army's intelligence program in Europe. See generally *Zweibon, supra* at 653–54. It is alleged and must be accepted as true for purposes of the pending motions that the plaintiffs were engaged in lawful political activity. Moreover, as plaintiffs point out, no evidence has been proffered by defendants that plaintiffs had any connection with a foreign power, and defendants do not dispute that the wiretaps did not involve collaboration with or action on behalf of a foreign power. The authority for the alleged electronic surveillance was AR 381–17, which permits surveillance when there are reasonable grounds to believe the person is engaged in criminal activity. In short, the wiretaps alleged in this case arise in a situation which, if located within the United States, clearly would require prior judicial authorization under *Keith*. The only distinguishing factor is the presence of the Army and plaintiffs overseas.

■ *Zweibon, supra*, is clearly applicable and controlling. This Court may restrain, as the Court of Appeals likewise did, from holding that "absent exigent circumstances no wiretapping in the area of foreign affairs should be exempt from prior judicial scrutiny, irrespective of the justification for the surveillance or the importance of the information sought." See 516 F.2d at 651. The circumstances presented here require only that this Court hold that absent exigent circumstances, prior judicial authoriza-

tion in the form of a warrant based on probable cause is required for electronic surveillance by the Army of American citizens or organizations located overseas when there is no evidence of collaboration with or action on behalf of a foreign power.[8]

■ The defendants' contentions arguing against a warrant requirement, while deserving of the most careful consideration, need little discussion after the extended analysis of similar arguments in *Zweibon*. See generally 516 F.2d at 633–51. Here, defendants advance five reasons militating against upholding the warrant requirement in this case: (1) the absence of a magistrate or judge in Europe, (2) the presence of "non-judicial factors" touching upon the conduct of foreign relations, including whether the subject has a significant connection with a foreign power, (3) the safeguards of the G–10 Law of the FRG, which must be complied with prior to any FRG wiretap, (4) the safeguards of AR 381–17, and (5) the unique situation presented in Berlin, an occupied city where there is an "unusually high level of activity . . . by hostile intelligence agents." Only the first and third considerations require discussion. The second argument has been rejected by the Court of Appeals in *Zweibon*, and under the circumstances of this case, by the Supreme Court in *Keith*. See 516 F.2d at 641–47; 407 U.S. at 320, 92 S.Ct. at 2138, 32 L.Ed.2d at 768.[9] The fourth argument begs the question, since AR 381–17 does not provide for prior judicial authorization, and the fifth contention has little force where, as here, there is no evidence or allegation that the wiretapped indi-

---

**8.** Whether the Court would make the same ruling if defendants were to introduce evidence of collaboration at a later stage need not be decided at this stage. The clear pronouncements of the *Zweibon* court, while admittedly dicta, would of course provide this Court with the framework within which to make that decision. See 516 F.2d at 613–14, 651.

**9.** Defendants' argument that the Secretary of the Army has superior competence to decide the propriety of electronic surveillance because of the foreign policy concerns is without

merit. The grounds for approving electronic surveillance under AR 381–17, quoted earlier, traditionally fall within the scope of judicial questions, namely, whether criminal activity is afoot. At least within the context of AR 381–17 and the limits of the Court's holding today, delicate foreign policy concerns and information play a relatively minor role in any decision to issue a warrant. There is no reason that the Secretary or Under Secretary of the Army is any more competent than a judicial officer to make such decisions.

viduals are collaborating with "hostile intelligence agents."

■ The first contention has merit but is not an obstacle to the warrant requirement. To be sure, Rule 41(a), F.R.Crim.P., authorizes issuance of a warrant by a judicial officer "within the district wherein the property is located." Rule 41(a) cannot limit or restrict the dictates of the Constitution to the United States, however, particularly when the Supreme Court has held those dictates applicable overseas. *Reid v. Covert, supra.* The court's authority over federal officials is sufficient to require an official to present for approval in the United States a warrant for a wiretap overseas. Such presentation may be through a representative or otherwise.[10] Indeed, under the Army's present regulations, procedure with substantially the same delay must be followed, since any wiretap of American citizens abroad must be approved by the Secretary or Under Secretary of the Army, who is located here in Washington, D. C. If exigent circumstances arise where prior judicial authorization cannot be obtained before the purpose of the wiretap would be defeated by the passage of time, then the exigent circumstances exception would permit institution of the wiretap, so long as post judicial authorization is sought within a reasonable time after the institution of the wiretap.[11]

Defendants also point to the safeguards in the G–10 law, which would be superimposed on any judicial authorization of a warrant by a United States judicial officer. This Court has no authority over the actions of German officials, however, and the Constitution guarantees that warrants shall issue from United States, not foreign, officials. While expressing no opinion as to the propriety of the G–10 law, this Court is constrained to hold that its provisions are irrelevant to the necessity for prior judicial authorization. See discussion, *supra.*

## DAMAGES—FIRST AMENDMENT

■ Defendants urge the Court to reject implication of a damages remedy for violation of plaintiffs' first amendment rights, arguing *Bivens v. Six Unknown Federal Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), should be limited to its facts. Alternatively, defendants argue that plaintiffs have not alleged the type of conduct which could support a finding that defendants had violated the first amendment.

*Bivens* established that a federal official can be held liable in damages for violation of a person's fourth amendment rights. Since *Bivens,* the majority of courts to consider the issue have held that *Bivens* applies to causes of action based on the first or fifth amendments as well. See *States Marine Lines, Inc. v. Shultz,* 498 F.2d 1146, 1156–57 (4th Cir. 1974) (fifth amendment); *U. S. ex rel. Moore v. Koelzer,* 457 F.2d 892, 894 (3d Cir. 1972) (fifth amendment); *Revis v. Laird,* 391 F.Supp. 1133, 1139 (E.D.Cal. 1975) (first and fifth amendments); *Gardels v. Murphy,* 377 F.Supp. 1389, 1398 (N.D.Ill.1974) (first amendment); *Butler v. United States,* 365 F.Supp. 1035, 1039–40 (D.Haw.1973) (first amendment); *Washington v. Brantley,* 352 F.Supp. 559, 563–64 (M.D.Fla.1972) (dictum); contra *Moore v. Schlesinger,* 384 F.Supp. 163, 165 (D.Colo.1974) (first amendment);

---

**10.** This Circuit recently expressed approval of a procedure whereby warrants could be approved telephonically, "based on sworn oral testimony communicated by telephone or other appropriate means, with procedures for recording, transcribing and certifying the statement." *United States v. Robinson,* 533 F.2d 578 (D.C.Cir. 1976). Use of such procedures seem particularly appropriate in the instant case, although the institution and form of such procedures should be left to the Secretary of the Army, to be reviewed by this Court at a later date.

**11.** In the absence of a factual basis for determining the length of time required to make application from a European command, the Court is hesitant to dictate a specific period. While reserving decision, the Court feels that 48 hours is not unreasonably short. Cf. 18 U.S.C. § 2518(7).

*Smothers v. CBS*, 351 F.Supp. 622, 626 (C.D.Cal.1972) (first amendment). This Circuit has twice expressly left open the question here presented. See *Greenya v. George Washington University*, 512 F.2d 556, 562–63 n. 13 (D.C.Cir. 1975); *Cardinale v. Washington Technical Institute*, 163 U.S.App.D.C. 123, 500 F.2d 791, 796 n. 5 (1974). Courts that have extended *Bivens* to other constitutionally protected interests have seen no compelling distinction between the fourth and first or fifth amendments. Clearly the interests. to be protected are equally if not more fundamental. And once a citizen's first amendment rights have been violated, he is without redress in the absence of monetary award. When a person has, however temporarily, lost the freedom of expression guaranteed him by the Constitution, because a federal official has attempted to restrain that person's expression, the injury is simply too great to permit it to go unredressed.

Defendants argue further, however, that plaintiffs' allegations do not reach the level required to permit redress of first amendment violations. According to defendants, plaintiffs must allege "a pattern of gross overt intimidation undertaken in bad faith to interfere with the exercise of first amendment rights." Def. Supp. Mem. at 65. The cases on which defendants principally rely for this proposition afford little support. The test proffered by defendants arises from *United States v. McLeod*, 385 F.2d 734, 750 (5th Cir. 1967), which grew out of local Alabama police attempts to hinder black voter registration drives in 1963. The Fifth Circuit made clear, however, that they were analyzing plaintiffs' first amendment claims, not in constitutional terms, but in statutory terms. 385 F.2d at 740. Under the Voting Rights Act of 1957, 42 U.S.C. § 1971(b), it was illegal "to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote." The court did not impute that

language to the first amendment, and there clearly is no need to do so here.[12]

▆ Plaintiffs have alleged disruption of their activities, illegal electronic surveillance, abusive dissemination of information, and exhortation by infiltrators to perform illegal acts, among other injuries. It is alleged that the electronic surveillance in some instances extended back to 1971, and in all instances continued at least for a period of months. While defendants attempt to minimize the incidents of alleged disruption, it is not enough to state that of the twenty-one individuals only four persons lost employment, one was subjected to deportation proceedings, two were exhorted to illegal action, and two were barred from U. S. military installations. Taken together with the allegations of illegal electronic surveillance, the complaint sets forth a concerted military effort to discredit certain groups of individuals for allegedly innocent activities. The claimed on-going nature of these abuses is sufficient to pass any *de minimis* test, even if applicable here.

## DAMAGES—SIXTH AMENDMENT

Plaintiff Johnson requests damages for the alleged violation of his sixth amendment rights through the defendants' electronic surveillance of conversations between his attorney and a consultant in which his defense was discussed. No court has yet held that *Bivens* should be extended to the Sixth Amendment. Justice Harlan in his concurrence in *Bivens* suggested that the proper inquiry is whether implication of a damages remedy is "necessary" and "appropriate" to the vindication of the interest asserted. Here, of course, the interest at stake is the right to effective assistance of counsel.

▆ Defendants urge this Court to limit redress of sixth amendment violations to the traditional remedy of reversal on appeal from conviction. They

---

**12.** The other case on which defendants rely, *Paton v. LaPrade*, 382 F.Supp. 1118 (D.N.J. 1974), has been reversed since defendants' mo-

tions were filed. See *Paton v. LaPrade*, 524 F.2d 862 (3d Cir. 1975).

premise this argument on their view that the sixth amendment only protects an individual's right to a fair trial. The right to reversal on appeal, however, is far more limited an interest than the right to a fair trial, which the sixth amendment protects. A criminal who has been convicted, as was plaintiff Johnson, regardless of appellate reversal, has suffered obvious harm through loss of his reputation, his financial resources, and perhaps his freedom pending appeal. Reversal on appeal may ameliorate the extent of these damages; it cannot eradicate them. If a conviction has been caused at least in part by violation of the criminal's sixth amendment rights, there is no adequate remedy other than damages to redress fully the resultant harm. Thus, the first prong of Justice Harlan's test—necessity—is satisfied.

Nor can it be said that a damages remedy is inappropriate. Justice Harlan focused on whether a court is equipped to analyze the harm involved as well as problems of causation and damages. In cases of sixth amendment violations, the Court need only analyze (1) whether the illegal act in fact prejudiced the defendant, and (2) the value to the defendant of the harm incurred. Questions of causation and valuation of damages are always thorny but never insuperable; courts traditionally have undertaken to answer both. There is no reason why a court could not answer them in cases alleging violations of the sixth amendment. Therefore, this Court holds that plaintiffs have stated a cause of action for damages under the sixth amendment.

■■■ Defendants also urge that the allegations by Johnson will not support a sixth amendment violation, since the alleged intercepts were of attorney/consultant, not attorney/client, conversations. The sixth amendment is not limited to the latter, however. As this Circuit stated in *Caldwell v. United States,* 92 U.S.App.D.C. 355, 205 F.2d 879, 881 (1953):

> The Constitution's prohibitions against unreasonable searches and its guarantees of due process of law and effec-

tive representation by counsel, lose most of their substance if the Government can with impunity place a secret agent in a lawyer's office to inspect the confidential papers of the defendant and his advisors, to listen to their conversations, and to participate in their counsels of defense.

See also *In re Terkeltoub,* 256 F.Supp. 683, 685 (S.D.N.Y.1962). In *Caldwell,* the court found the government's actions, which went far beyond interception of attorney/client statements, to violate the sixth amendment. Clearly, government knowledge of defense strategy, whether or not uttered between attorney and client, obviously would impair the defense. *Cf. Hoffa v. United States,* 385 U.S. 293, 306–08, 87 S.Ct. 408, 415–416, 17 L.Ed.2d 374, 384–385 (1966).

■■■ Of course, in order for plaintiff Johnson to recover damages in this action—or to gain equitable relief—he would necessarily be required to show that interception of his attorney's conversations caused his conviction. Causation being a question of fact, in the absence of discovery, this Court cannot now dismiss plaintiff Johnson's sixth amendment complaint.

## STATUTORY CAUSES OF ACTION

In their second and fifth causes of action, plaintiffs seek relief based in part on 18 U.S.C. §§ 1702, 2510–20. Title 18 United States Code Section 1702 imposes criminal penalties for obstruction and opening of the mails; Title 18 United States Code Sections 2510–2520 proscribe procedures for installation of wiretaps, criminalize certain conduct, and grant a civil cause of action for violation of the procedures.

■■■ To the extent that plaintiff's causes of action are based on either of these two statutes, they are without basis. Section 1702 is purely a criminal statute and cannot support a civil cause of action, *United States ex rel. Pope v. Hendricks,* 326 F.Supp. 699, 701 (E.D.Pa. 1971). And Sections 2510–2520 have no extraterritorial effect. *United States v.*

*Toscanino*, 500 F.2d 267, 279–80 (2d Cir. 1974).

## CLASS ACTION

Plaintiffs have moved to certify this action as a class action on behalf of:

all United States civilians currently or formerly residing in the Federal Republic of Germany and the City of West Berlin who engage or have engaged in lawful, constitutionally protected political, religious, educational and social activities, such as the practice of law in military courts-martial, the organization and conduct of political campaigns and other political activities, teaching or studying at educational institutions and the practice of journalism or other forms of writing, and who as a result of these activities have been, are now or hereafter may become, the subjects of covert physical or electronic surveillance by the defendants and their agents, resulting in the maintenance and dissemination of dossiers, reports and files about them and their constitutionally protected activities in and from defendants' data banks and intelligence network.

Even assuming that the class as defined would satisfy the four prerequisites of Rule 23(a), the class should not be certified under Rule 23(b)(1), (2), or (3).

▉ Rule 23(b)(1)(A), which plaintiffs contend would support certification, permits maintenance of a class if "[T]he prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." Before determining whether "incompatible standards of conduct" could result, it is necessary to ascertain the risk of adjudication by other members of the class. *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564 (2d Cir. 1968); Wright & Miller, Federal Practice and Procedure § 1773, p. 8. As plaintiffs themselves observe, "probably no other members of

the class . . . could mount the sort of challenge to the defendants' activities which the plaintiffs are carrying on." Pl. Mem. in Support of Motion for Class Action Certification at 26. And in fact, "notwithstanding the press coverage of this case in Germany," "no other potential members of the class have filed a separate action" alleging constitutional violations similar to those alleged here. *Id.* Since there is little likelihood of other similar litigation, certification of Rule 23(b)(1)(A) would be inappropriate.

▉ Nor should the class be certified under Rule 23(b)(2) or (b)(3). In order to maintain a (b)(3) class action, the Court must find "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Four matters are "pertinent" to this finding. The fourth factor, "the difficulties likely to be encountered in the management of a class action," when considered in light of the nature of this litigation, argues against certification. If a class were to be certified, plaintiffs would be permitted to inquire into the past and present scope of military intelligence gathering activities in Europe to determine if any of the practices alleged in the complaint have been inflicted on others. Identification of persons surveilled, the time period during which they were being surveilled, the type of surveillance methods, etc., would necessarily be disclosed. While Rule 26(c) provides protective procedures to the courts which would keep much of the information confidential, it can fairly be anticipated that discovery of these matters would become enmeshed in complex procedural motions resulting in *in camera* inspections by the Court and subsequent delay. In light of the fact that injunctive relief can be tailored in such a way that the challenged activities—if found unconstitutional—would effectively be prohibited in favor of all members of the class, certification would not be "superior to other available methods for the fair and efficient adjudication of the controversy."

▉ This latter point also undercuts the necessity for a (b)(2) class action. A

(b)(2) class action may be maintained where "the party opposing the class has acted or refused to act on grounds generally applicable to the class," thereby making injunctive or declaratory relief "appropriate." Where the burdens of maintaining a (b)(2) class action are substantial, as here, due to the discovery problems that will inevitably arise, and where injunctive relief will run to the class at any rate, there is no need for certification of the class. See *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, Fla.*, 493 F.2d 799, 812 (5th Cir. 1974); *Worthen Bank & Trust Co. v. National Bankamericard, Inc.*, 345 F.Supp. 1323, 1326–27 (E.D.Ark.1972); *Edwards v. Schlesinger*, 377 F.Supp. 1091, 1093 (D.D.C.1974). Here, the Court if appropriate could easily declare illegal, and enjoin defendants from partaking in, practices of harassment and electronic surveillance as alleged in the complaint as a response to lawful first amendment expression by U. S. citizens in Germany. Thus, there is no need to maintain a class action.

At oral argument on the pending motions, plaintiffs' counsel suggested that the Court delay its decision regarding certification until it can be determined through discovery that the class in fact is not manageable. Such a procedure, however, would enmesh the Court and the parties in the very thicket of procedural difficulties that argues against certification, and must be rejected.

In light of the foregoing, it is this 17th day of March, 1976

ORDERED that plaintiffs' Motion to Amend the Second Amended Complaint be and the same hereby is granted; and it is further

ORDERED that plaintiffs' Motion for Class Action Certification be and the same hereby is denied, and it is further

ORDERED that plaintiffs' Motion to Dissolve the Protective Order entered by this Court May 24, 1974 be and the same hereby is granted; and it is further

ORDERED that defendants' Motion to Dismiss or in the alternative for Summary Judgment be and the same hereby is denied, and it is further

ORDERED that Tomi Schwaetzer be and hereby is dismissed as a party plaintiff for lack of standing to sue.