UNITED STATES of America, Plaintiff,

v.

EIGHT (8) RHODESIAN STONE
STATUES, Defendants,

Dr. David Brokensha, Claimant.

No. CV 77–643–IH.

United States District Court,
C. D. California.

Feb. 24, 1978.

Andrea Sheridan Ordin, U. S. Atty., by Michael E. Wolfson, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Stein, Shostak, Shostak & O'Hara, Inc. by Thomas Trager, Los Angeles, Cal., for claimant.

OPINION

IRVING HILL, District Judge.

▉ In this case, the government seized 8 small stone statues imported from Rhodesia on account of alleged violations of certain customs laws (19 U.S.C. § 1592) and economic sanctions (22 U.S.C. § 287c). Thereafter, the government commenced the instant in rem action to secure a decree of forfeiture.[1] The owner of the statues contests the action as a claimant. A separate motion for summary judgment was filed by each party. The government's motion argues on the merits that the government is entitled to a decree of forfeiture and full title to the statues. The claimant's motion argues that the government has now lost its right to obtain title, regardless of the merits of the forfeiture action it might once have had, because of procedural defects and time delays. The claimant's motion seeks a judgment ordering immediate return of the statues.

The Court grants the claimant's motion and denies the government's motion. The government is held to be barred from obtaining a decree of forfeiture on due process grounds—because of procedural deficiencies in connection with the seizure and because of substantial time delays between the seizure and the institution of the district court action. The grant of the claimant's motion on due process grounds renders moot the government's motion on the merits. So the Court makes no factual or legal determination as to whether the government could have obtained a decree of forfeiture if the said due process violations had not occurred.

## I. FACTS

It is necessary to recite the facts of the case at considerable length. The claimant,

---

1. The term "forfeiture" is best defined as the divestiture without compensation of property used in a manner contrary to the laws of the sovereign. Whenever a statute provides that upon the commission of a specified act, certain property used in or connected with that act shall be "forfeited," the forfeiture takes place immediately upon the commission of the act, and a conditional right to the property then vests in the government. The right is first asserted by the government's seizure of the property. However, the government's title is not perfected until a decree of judicial condemnation is obtained. 21 Am.Jur.2d, *Customs Duties and Import Regulations*, § 125 (2nd ed. 1965); *cf. Mayo v. United States*, 413 F.Supp. 160 (E.D.Ill.1976), *citing United States v. Stowell*, 133 U.S. 1, 10 S.Ct. 244, 33 L.Ed. 555 (1889).

David W. Brokensha, is a professor of anthropology at the University of California at Santa Barbara. He apparently specializes in African culture. The professor bought the statues about August 5, 1968, in Rhodesia while on an African trip. He bought them from the National Gallery of Rhodesia at Salisbury, paying $200 for the lot of eight. Photographs of the statues are in evidence; but there is in the record no detailed verbal description of them. The undersigned is himself a desultory collector of primitive folk art and sculpture, including items from Africa, and I will attempt to describe them. These statues are stone carvings, apparently of soapstone or some other soft stone, simple and quite primitive. The record indicates they were made by black native Rhodesians. The professor believes the statues to be modern, estimating that they were only 5 to 10 years old when he bought them. He believes that these statues are significantly different from prior native sculpture produced in the same area and that they evidence a kind of new movement in the native art of the region. Apparently other scholars agree with him because the statues have been exhibited by at least two important American museums since 1968, on loan from the professor.

There is no claim that these statues are Rhodesian national treasures or were illegally exported from Rhodesia. They were seized because they are Rhodesian in origin and because at the time of their importation (and apparently down to the present time), importation of Rhodesian goods was not permitted under American law.[2]

Under U.N. auspices, various nations of the world have for some years imposed various economic sanctions on Rhodesia to protest Rhodesia's treatment of its black majority. The United States took its first steps in that movement by Executive Order No. 11322 (found at 22 U.S.C. § 287c), issued on January 5, 1967, which does not apply to the instant case because it does not include art objects within its prohibition.

On July 29, 1968 (a week before these statues were purchased), Executive Order 11419 (found at 22 U.S.C. § 287c) was issued which greatly broadened the prior restrictions on importation of Rhodesian goods. E.O. 11419 became immediately effective and is phrased as a total prohibition on importation of any commodity or product originating in Rhodesia. Art objects are not exempted. The various cabinet secretaries charged with the enforcement of the prohibitions are each given authority in the Executive Order to "issue such regulations, licenses or other authorizations as he considers necessary to carry out the purposes of this Order . . ."[3]

The regulations issued pursuant to Executive Order 11419 authorize the Secretary of the Treasury to grant general import licenses involving certain specified Rhodesian commodities and transactions. In addition, the regulations allow for the issuance of specific import licenses on an ad hoc basis.[4]

When the statues reached this country on November 22, 1968, at Los Angeles, the professor was on hand personally. He did not apply for any import license. He sought to have the statues enter as original works of art, duty-free, and they were so recognized. There is a printed claim form issued by the Bureau of Customs intended for use in claiming that an item is an original work of art. The form is entitled "Declaration for Free Entry of Works of Art, Artistic Antiquities, Original Paintings, Statuary, etc." Professor Brokensha filled in one of these forms and stated on it that the place of origin of the statues was Mo-

2. The government in its district court complaint gives two bases for the instant forfeiture: violation of 22 U.S.C. § 287c (economic sanctions) and Executive Order 11419 imposing sanctions with respect to Rhodesian goods, and violation of 19 U.S.C. § 1592, procuring the entry of merchandise by means of a false statement. The alleged false statement is further discussed in Footnote 5, *infra*.

3. Executive Order No. 11419 § 4(b), 22 U.S.C. § 287c.

4. The regulations are found at 31 C.F.R. § 530.-101–.809.

zambique. This erroneous statement, the government contends, constitutes a violation of 19 U.S.C. § 1592 and provides a separate basis for forfeiture of the statues, in addition to the apparent violation of the Executive Order 11419. The professor has offered a colorably persuasive explanation of the misstatement.[5]

The evidence before the Court is clear and uncontradicted that for seven years after the importation of the statues, the professor made no attempt to hide their existence and no attempt to confuse anyone as to their country of origin. On the contrary, he has continually referred to the statues as Rhodesian works in his academic lectures and writings, and on loan from him, they were exhibited in at least two museums as Rhodesian works. Professor Brokensha retained ownership of the statues and the right to their possession from the time of importation to and including the date of seizure. In August of 1975, almost

7 years after the statues entered the country, they were seized while on exhibit at the American Museum of Natural History in New York City[6] by customs agents attached to the New York office of the Customs Service.

Apparently there had been some governmental inquiry about the importation of the statues because Professor Brokensha had employed a firm of Los Angeles attorneys specializing in customs law to represent him in connection with the statues even before their seizure. All of the correspondence referred to *infra,* to and from the government, came from those attorneys or was addressed to them.

On October 20, 1975, about 2 months after the seizure, the professor's attorney commenced what was to become a series of letters to various officials of the Customs Service in Los Angeles and New York dealing with the seizure and return of the stat-

---

5. Professor Brokensha claims that during his African trip, he entered Mozambique from Rhodesia with the statues in his possession. He was told that, to satisfy the Mozambique customs laws, he needed a certificate concerning the origin of the statues. A certificate was in fact prepared at that time which stated that Mozambique was the country of their origin, but the professor states that he neither prepared that certificate nor did he know before its issuance of the misrepresentation it contained. He further says that he did not at any time request that the certificate be prepared to show Mozambique as the country of origin. Apparently that certificate secured admission of the statues to Mozambique.

When the statues entered this country, Professor Brokensha claims that he orally divulged to American customs officials the fact that the statues came from Rhodesia and did so before executing the American declaration form. He claims that the American customs officers to whom he was speaking suggested he write "Mozambique" on the American form as the place of origin "in order to save endless bureaucratic delays and problems" and in order to make all documents consistent. He disclaims any intent to mislead or defraud anyone, pointing to the fact that artistic items of Rhodesian origin were at that time being exhibited in Britain, the country which had taken the lead in initial sanctions against Rhodesia, and that frequent discussions of Rhodesian art objects of the same type were contemporaneously appearing in various international journals with no caution as to legal problems being

encountered in the exportation or importation thereof. He points further to his own continuous, open and notorious publicizing and exhibiting of these statues as Rhodesian works after their entrance.

This explanation is furnished by the professor in answers to interrogatories. The professor has not been cross-examined about them and the Court has heard no live testimony about them. Obviously, the Court does not decide the truth or falsity of the explanation, although the professor's fact statements are uncontradicted by the government.

6. The Court does not rest its decision in any way on the lapse of approximately 7 years between importation and seizure. The government claims that it cannot be accused of delay during this 7-year period because it did not discover the existence of the statues in the United States as being of Rhodesian origin until early in 1975. This claim of late discovery is totally undocumented; it is advanced in the briefs and is not supported by any affidavit or declaration of anyone. In view of this lack of documentation, if Professor Brokensha's uncontradicted assertions of open and notorious display of the statues as Rhodesian works of art is believed, the applicable statute of limitations (19 U.S.C. § 1621) would bar the government's action. But it is not necessary to rest the decision on that ground or to refer to the 7-year pre-seizure period in view of the improprieties found to have occurred in the government's conduct following the seizure.

ues. Of particular note are the letters of November 20, 1975, and April 12, 1976, described *infra*. This correspondence from claimant's counsel articulates and reiterates four main propositions:

1. Claimant has not received official notice of seizure including notice of the authority under which the seizure was made.

2. Claimant believes the seizure was erroneous and illegal and wants to know which District Director or Area Director[7] of the Customs Service he should address in seeking the return of the statues.

3. Claimant desires the matter to be determined and settled as quickly as possible.

4. Claimant asserts that the failure of the government to proceed in an expeditious manner and as required by law, may well have adversely affected the government's right to proceed further in its forfeiture action. (This claim appears in the later portion of the correspondence.)

The replies to these letters, when replies were forthcoming at all, were often months late and were not distinguished by their precision or clarity. In essence, the government continued to ignore all of the requests and statements made in the claimant's letters. Instead, the government embarked on a ping-pong game, batting the case and the claimant back and forth between the Los Angeles and New York offices of the Customs Service. But the game was played without the crispness and speed one normally associates with ping-pong. It was a surrealistic ping-pong game in that every government stroke was delivered with excruciating slowness as the following chronology demonstrates.

On October 20, 1975, the claimant's attorney addressed a short letter to the Area Director of Customs at New York City in which he asked that official notice of seizure and all other relevant correspondence be sent to the attorney's office. There was no reply, and on November 17, 1975, the attorney telephoned the New York office to find out why. He was then informed that the official notice of seizure would be issued by the Los Angeles office after the New York office had completed its investigation. So, three days later, the attorney wrote to the District Director at Los Angeles. He again asked that official notice of seizure be sent and stressed that the 3-month delay since seizure had already prejudiced the claimant's right to a fair and expeditious hearing. The letter concludes with a request that Professor Brokensha be advised "as soon as possible of the manner in which the U.S. Customs Service intends to proceed in this case." No reply to this letter was ever received from the Los Angeles office. Instead, on December 11, 1975, the New York office wrote to claimant's attorney telling him that the case would be handled by the Los Angeles office. The New York letter concluded, "Our files on these matters will be held in abeyance pending a final report from the Los Angeles office."

The attorney waited from winter until spring for further information or action. On April 12, 1976, he again addressed the District Director at Los Angeles. This letter again stressed the absence of formal notification and complained of the absence of advice as to the legal basis of the government's seizure. It demanded the immediate release of the seized items and discussed various legal authorities requiring expeditious action in the field of customs seizure. It noted that the claimant had not even been told where the proper forum would be for filing an administrative claim for return of the statues. Again, there was a total failure on the part of the Los Angeles District Director, the addressee, to reply.

When summer came, the attorney received a letter dated July 27, 1976, from the New York office, which made no mention of any prior correspondence and merely informed him "that this matter is definitely being handled by the Los Angeles office . . . .".

When fall came, the office of the New York Area Director addressed a letter dated October 14, 1976, to the attorney in which

---

7. For some unexplained reason, the chief customs officer at New York City is called "Area Director" whereas all of his counterparts are called "District Directors".

(though cryptic in other respects) it clearly appears that the New York office had decided that it was handling the case. Moreover (wonder of wonders!) the New York office had not only determined that it was handling the case—and was now prepared to state the legal basis of the seizure—but also had gone on to *decide* the case. The letter states that the seizure of the statues had been made under the provisions of 18 U.S.C. § 545. That section is a criminal statute punishing smuggling. It had not theretofore, and has not at any time thereafter, been utilized by the government as a basis for any of its acts in the instant case. So the legal basis for seizure as finally announced to the professor 14 months after seizure, was erroneously stated.

The letter then goes on to assert that possession of any Rhodesian products is prohibited "under any circumstances" and tells the claimant ". . . based on this, your *petition* seeking release of the articles *is denied.*" (emphasis supplied). The only trouble with that conclusion is the fact that the claimant had never filed a petition for administrative remission of the forfeiture or any other petition. To the contrary, he had been desperately trying, without success, to find out where such a petition for remission could be filed.

On November 1, 1976, the New York Area Director wrote to the attorney informing him that the case was being referred to the U.S. Attorney for the Southern District of New York for forfeiture action in the district court. In a masterpiece of understatement, this letter also says, ". . . apparently this whole matter was handled in a confused manner . . . .".

Following the receipt of this letter, there were apparently some negotiations between the claimant's lawyer and the U.S. Attorney's office in New York City in which the subject of which U.S. Attorney's office had jurisdiction was again examined.[8] The U.S.

Attorney's office in New York finally determined that the matter of filing an action in district court should be transferred to the U.S. Attorney's office in Los Angeles. The instant action was thereafter instituted by the U.S. Attorney's office in Los Angeles on February 24, 1977, eight and a half years after the importation and about 18 months after the seizure.

## II. DISCUSSION OF THE LAW: WERE THE PROCEDURAL DEFICIENCIES AND DELAYS ATTRIBUTABLE TO THE GOVERNMENT SUFFICIENT TO BAR THE GOVERNMENT FROM PROCEEDING TO OBTAIN A DECREE OF FORFEITURE?

When a customs officer seizes the property of a citizen under a claim that it entered the country illegally, he does so without any prior notice or hearing. The Supreme Court has described such seizures as "extraordinary situations". *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed. 452 (1974); *cf. Fuentes v. Shevin,* 407 U.S. 67, 90, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Because the remedy is so summary and the effect on the citizen's property rights is so drastic, recent cases require strict compliance with the statutes and regulations governing post-seizure proceedings and require that all such proceedings and determinations take place without unnecessary delay.[9]

So it is appropriate in the instant case to review briefly the post-seizure scheme as contained in the applicable statutes and regulations in order to assess the extent of the government's compliance and the effect of its various delays. The statutes are found at 19 U.S.C. §§ 1602–1624 and the regulations are found at 19 C.F.R. § 162.31 and 19 C.F.R. §§ 171.11–.13.

Under 19 U.S.C. § 1602, the seizing officer is required "immediately" to report the seizure to the appropriate customs officer

---

8. During these negotiations, counsel for the claimant agreed that the 8 weeks of time spent in the negotiations should not be counted against the government in any claim of delay.

9. *United States v. One 1970 Ford Pickup,* 564 F.2d 864 (9th Cir. 1977); *States Marine Lines v. Shultz,* 498 F.2d 1146 (4th Cir. 1974); *Sarkisian v. United States,* 472 F.2d 468 (10th Cir. 1972).

for the district in which the violation of law occurred and to deliver the seized goods to him. In the instant case the violation of law obviously occurred in Los Angeles as the government now concedes. The government also concedes that in all the months from the seizure in August, 1975, to the hearing of claimant's motion for summary judgment in this Court on October 6, 1977, there was never any report of the seizure to the Los Angeles District Director.

19 U.S.C. § 1603 provides that when a seizure of property has been made for violation of the customs laws and legal proceedings by the U.S. Attorney are required, the appropriate customs officer has the duty to report such seizure either to the U.S. Attorney for the district in which the violation of law occurred or to the U.S. Attorney for the district in which the seizure was made. The report must include all of the facts and circumstances of the case and a citation of the statute or statutes believed to have been violated. This section has been construed to require the same promptness and immediacy as is expressly required by the other governing sections. *See United States v. One 1970 Ford Pickup,* 564 F.2d 864 (9th Cir. 1977); *Sarkisian v. United States,* 472 F.2d 468 (10th Cir. 1972); *States Marine Lines v. Shultz,* 498 F.2d 1146 (4th Cir. 1974).

In the instant case, no report of the seizure was made to either permissible U.S. Attorney until November 1, 1976, about 14½ months later. On that date as above stated, the matter was sent to the U.S. Attorney in New York City for institution of an action.

19 U.S.C. § 1604 provides that when the U.S. Attorney receives the report referred to in Section 1603, it shall be his duty "immediately" to inquire into the facts and the law applicable to the case. If proceedings in the U.S. District Court are necessary, the U.S. Attorney is required "forthwith" to commence such proceedings and to prosecute them "without delay". There is no doubt that the institution of a district court action was necessary in the instant case.[10]

19 U.S.C. § 1618 provides for an administrative proceeding to consider remission or mitigation of a seizure. Under that section, any person interested in seized property may petition the Secretary of the Treasury for the remission or mitigation of the forfeiture (meaning the return of the seized goods). The Secretary is given the discretion to return the goods if he finds that the forfeiture was incurred without any willful negligence or without any intention on the part of the petitioner to violate the law or if he finds such other mitigating facts as would justify returning them.

A growing number of decisions enunciate the proposition that both the adjudication of the administrative claim and the filing of a court action when required, must be speedily done. *See e. g., Lee v. Thornton,* 538 F.2d 27 (2nd Cir. 1976) (administrative claims); *States Marine Lines v. Shultz, supra* ; *United States v. One 1970 Ford Pickup, supra* ; and *United States v. One 1971 Opel G. T.,* 360 F.Supp. 638 (C.D.Cal.1973) (court action). And the pendency of an administrative claim does not excuse government delay in filing the court proceeding.[11]

19 U.S.C. § 1624 gives the Secretary of the Treasury the authority to make regulations in the entire field of forfeitures and many have been promulgated. The regula-

---

**10.** If seized property is appraised at more than $2,500, district court proceedings are required to obtain a judicial decree of forfeiture. 19 U.S.C. § 1610. *See Wiren v. Eide,* 542 F.2d 757 (9th Cir. 1976). If appraised at $2,500 or less, 19 U.S.C. § 1607 provides for a summary forfeiture and sale by the Secretary without judicial proceedings after publication of notice for 3 successive weeks. But a claimant may file a bond within 20 days from the date of the first publication of notice after which summary for-

feiture and sale are no longer possible and a judicial action must be instituted to perfect the government's title to the property. 19 U.S.C. § 1608. Neither side contended in the instant case that an appraisal of $2,500 or less had been made. The Court, therefore, assumes that the appraisal was in a sum over $2,500 and that 19 U.S.C. § 1610 is applicable.

**11.** See the cases cited at Footnote 16, *infra.*

tion which is of critical importance in the instant case is found at 19 C.F.R. § 162.-31(a). In applicable part it provides:

"Written notice of any . . . liability to forfeiture shall be given to each party that the facts of record indicate has an interest in the . . . seized property . . . The notice shall also inform each interested party of his right to apply for relief under [19 U.S.C. § 1618] . . . ."

The evident meaning of the regulation is, I believe, that the Customs Service must, in a formal written notice, tell a claimant to property which it has seized: (1) that a seizure has occurred, describing what has been seized and where; (2) the authority under which the seizure has been made, i. e., the alleged violation of law; and (3) that the claimant has the right to file a petition for remission and mitigation under 19 U.S.C. § 1618. In connection with the last item, the interested party must also be told which customs office has jurisdiction so he will know where to file such a petition if he wants to file one.

Apparently the Secretary has not, by regulation or otherwise, prescribed a printed form of notice under 19 C.F.R. § 162.31, nor has he set forth in any regulation all of the detailed information which the notice must contain.[12] The above-stated three requirements for the notice are thus court-declared, but I find them to be the minimum information necessary in order to give substance and meaning to the various rights granted in the statutes and regulations.

It appears that certain of the Customs Service District Directors have developed various forms of notice under § 162.31 which they customarily use in their own areas. A sample of the form customarily used by the Los Angeles District Director was received in evidence as Exhibit 1A and is reproduced in the margin.[13] As will be seen, it meets the three requirements enunciated above. It provides the claimant with formal notice of seizure and a description of the property seized. It cites the statutory authority for the forfeiture and the alleged illegal act which underlies the seizure. It makes reference to the right to file a written petition for remission and the sections of the statutes and regulations under which that may be done. It directs that the petition be signed and filed in triplicate and specifies the time within which it may be filed and its directs that it be filed with the Los Angeles District Director, giving his address.

In the instant case, neither this type of notice nor any similar notice was ever sent to Professor Brokensha or his counsel.

12. There are regulations dealing with the form and content of a petition for remission or mitigation. See 19 C.F.R. §§ 171.11–.13. But those regulations are indefinite and obscure when it comes to the question of which district director has jurisdiction and thus should be the recipient of the petition in a multi-district situation like the present case. See particularly 19 C.F.R. § 171.12(a) _ _ _

13. "DEPARTMENT OF THE TREASURY
U.S. Customs Service
Los Angeles, California

Dear Mr. :
This is to officially notify you that on July 1, 1977 This office seized the following merchandise at Customhouse Public Stores, CA: The merchandise, which has an appraised domestic value of $_____, was seized pursuant to title 19, United States Code, section 1592, when it was found that the goods were entered by means of false invoices or documents. The merchandise is subject to forfeiture to the United States and to sale or other disposition after forfeiture as prescribed by law.
Title 19, United States Code, section 1618 and title 19, Code of Federal Regulations, section 171.11, provide anyone incurring forfeiture of seized merchandise the right to file a written petition for remission of forfeiture of the merchandise. The petition must be signed and filed, in triplicate, with the District Director of Customs, 300 South Ferry Street, Terminal Island, CA 90731, Attn: Fines, Penalties & Forfeitures, within 60 days from the date of this letter.
The petition need not be in any specific form, but it should include all facts which you believe will warrant the granting of relief from the forfeiture of the merchandise.
Sincerely yours,
/s/ John E. Brady
JOHN E. BRADY
District Director"

■ In the Court's view, the failure to serve Professor Brokensha with a formal notice as required by the regulations and containing the information above specified was critical to his rights. Each element of the notice as outlined above serves an important function. The deprivation of any of the above specified elements of the notice might well involve a violation of due process. In my view, the total absence of the notice, under the facts of this case, clearly involves a deprivation of due process.

I recognize that element (1), advice that a seizure has occurred and a listing of the property seized, may be of lesser importance in this particular case. The professor makes no claim that he did not know promptly that the seizure had occurred, where it took place or what property of his had been seized. But in other cases, informing the apparent owners of the property of those facts, and doing so promptly, could well be critical.

■ Element (2), a statement of the authority under which the seizure was made, is also of great importance in a due process context. In a democracy, it is a cardinal principle that when the government undertakes action affecting the rights of a citizen to liberty or property, it must announce the authority under which it is acting. For example, one who is arrested has the right to know the charge; one who is immediately deprived of possession of his property by a declaration of taking in a condemnation proceeding is entitled to know the legal authority for the condemnation. 40 U.S.C. § 258a. And even a traffic or parking ticket contains a statement of the ordinance or law alleged to have been violated. To know the legal basis for the government's action is the indispensable predicate for a citizen to exercise his right to contest the validity of that action. *Cf. Groppi v. Leslie,* 404 U.S. 496, 502, 92 S.Ct. 582, 30 L.Ed.2d 632 (1971). In the context of a customs forfeiture, the citizen can neither adequately prepare his petition for remission nor exercise other legal remedies which may be available to him unless he is aware of what law he is alleged to have broken.

■ Element (3) of the notice (i. e., an advice of the right to file a petition for remission or mitigation and where to file it) may well be the most important of the three elements. In 19 U.S.C. § 1618, Congress has afforded the owner of seized property an opportunity to seek its release in an administrative proceeding. This remedy is quite evidently designed for two purposes: first, to permit an administrative review of the propriety of the seizure and the equities involved before any formal court action begins, and second, to give a claimant to seized property a quick, expeditious method of getting his property back without the necessity of hiring a lawyer to defend a court proceeding. *Cf. United States v. One 1971 Opel G.T., supra; Ivers v. United States,* 413 F.Supp. 394 (N.D.Cal. 1975).

The Second Circuit has recently held that a claimant who has filed an administrative petition is, as a matter of due process, entitled to an early preliminary decision on his petition and, if it is not granted in full, an early hearing on it. *Lee v. Thornton,* 538 F.2d 27 (2nd Cir. 1976). There, the court held that under the circumstances of that case it was necessary for the government to act upon a remission petition within 24 hours of its filing by making a decision as to whether to grant or deny it, and if the property was not unconditionally returned, a hearing was required within 72 hours thereafter to determine if there was probable cause for seizure. The government's failure to do either of those things within the respective time limits was held to be fatal to its right to obtain a forfeiture decree.

If the right to an early decision on an administrative petition, and early hearing thereafter where the petition is denied, is constitutionally mandated, it would seem to follow *a fortiori,* that prompt notice of the right to file such a petition would be likewise mandated.

■ Under the facts of the instant case, where no notice was ever sent and where the government could never make up its mind as to which of its customs offices, Los

Angeles or New York, was assuming jurisdiction, I conclude that the claimant was deprived of both the right to file his petition and the corollary right to a prompt hearing and determination thereon.[14]

██ The government argues that a letter of December 11, 1975, from the New York Customs Office to the professor's attorney is substantial compliance with the notice requirement. I do not agree. The letter is quoted in the margin.[15] A reading of it demonstrates that it meets none of the requisites of the required notice as outlined above except mentioning that certain Rhodesian statues had been seized several

---

**14.** The government's confusion and indecision as exhibited in the instant case is understandable when one reads the statutes carefully. For example, 19 U.S.C. § 1602 requires the seizing officer to report the seizure and turn over the seized goods to the appropriate customs officer for the "*district in which the violation occurred*" (emphasis supplied). When the government seeks a judicial decree confirming its title to the seized goods, it must proceed in rem; and the instant case invokes in rem jurisdiction. It is a truism that one may proceed in rem only in the district in which the goods are then physically present. 4 Wright and Miller, *Federal Practice and Procedure*, § 1070 at 270 (1969). Thus, one would logically conclude that the instant judicial proceeding was required to be brought in Los Angeles where the alleged violation occurred because the goods were required by § 1602 to be turned over to the Los Angeles District Director.

The issue is somewhat complicated by the wording of 19 U.S.C. § 1603. That section provides that "Whenever a seizure of merchandise for violation of the customs laws is made . . . and legal proceedings by the United States attorney in connection with such seizure . . . are required, it shall be the duty of the appropriate customs officer to report such seizure . . . to the United States attorney *for the district in which such violation has occurred [Los Angeles], or in which such seizure was made [New York]* . . . ." (emphasis supplied). According to this section, the Los Angeles District Director to whom the New York seizing officer had turned over the goods, could choose to report either to the New York U. S. Attorney or the Los Angeles U. S. Attorney. If sections 1602 and 1603 were the only applicable statutes, his choice would seem clear. Since the Los Angeles District Director had had the goods turned over to him, it would be logical that he make his report to the Los Angeles U. S. Attorney.

But the entire matter becomes far less clear, even confused, because it appears that still another statute may also be applicable, i. e., 19 U.S.C. § 1610. That section applies whenever goods seized for customs violations are appraised at more than $2,500. That section requires the "appropriate customs officer" (who in this instance is apparently the Los Angeles District Director under § 1602) to transmit a report of the case to a U. S. Attorney "for the institution of proper proceedings for the con-

demnation of such property." But it directs that said report be made to the U. S. Attorney "*for the district in which the seizure was made.*" (emphasis supplied). A literal application of § 1610 to the instant case would result in the following paradox: the Los Angeles District Director to whom the New York seizing officer had turned over the goods as required by § 1602 (because the violation had occurred in Los Angeles) would then be required to report the case to the U. S. Attorney in New York (where the seizure had occurred) for the institution of judicial proceedings in New York, which judicial proceedings could not be instituted in New York because the proceedings are in rem proceedings and the goods remained in Los Angeles.

Since these apparent statutory inconsistencies were not discussed in the briefs or argument, I do no more than point them out.

**15.** "DEPARTMENT OF THE TREASURY
U.S. Customs Service
New York, N.Y.

December 11, 1975

Thomas R. Trager
Stein and Shostak
Equitable Building
3435 Wilshire Boulevard
Los Angeles, California 90010

Dear Sir:
Reference is made to your letter dated October 20, 1975, relative to the seizure of seven Rhodesian statues on August 13, 1975, imported into the United States by David Brokenshaw. The statues were entered at Los Angeles, California.
Please be advised that although the items were seized at New York, the cases themselves will be handled by the Office of the Regional Director of Investigations, Los Angeles.
Please forward all future correspondence to that office.
Our files on these matters will be held in abeyance pending a final report from the Los Angeles Office.
 Sincerely yours,
 /s/ Joseph Manta
 Fines, Penalties & Forfeitures,
 Specialist"

months earlier. Typically, the letter does not even contain the correct number of statues which were seized; there were 8 seized, not 7 as the letter says. This letter is not only insufficient in form and content to constitute the required notice, it was also dispatched too late to meet the constitutional requirements for prompt notice and prompt opportunity for decision and hearing of a possible administrative petition.

■ The government further contends that any deficiency in its notice, and particularly any failure to notify the professor of his right to file a petition for remission or mitigation, was rendered moot by the fact that such a petition was actually filed by him. The government argues that a letter from the professor's counsel to the Los Angeles District Director dated April 12, 1976, is "in effect" a petition under 19 U.S.C. § 1618. The government is wrong. The letter is too long to be reproduced in this opinion, but its content can be briefly summarized. It contains no language of intention to petition for remission or mitigation. It is not such a petition in form or in substance. It is a continuation of the prior protest that no statement of the legal basis for the seizure has been furnished. It contains the previously made assertion that there are many policy and equity considerations which would warrant returning the statues to the professor, but it does not list or argue those considerations. The bulk of the letter is a discussion of the legal precedents on the subject of government delay and due process in this field, leading to a contention that the government has lost all right to proceed. The letter cannot, by any stretch of the imagination, be construed as a petition for remission or mitigation under 19 U.S.C. § 1618.

Thus far we have seen that the government gave Professor Brokensha no formal notice of the seizure, that none of the requisites of a proper notice were otherwise fulfilled, and that no effective opportunity was afforded him to utilize the administrative remedies of 19 U.S.C. § 1618. Those facts, in and of themselves, may well be fatal to the government's right to proceed

because, in and of themselves, they amount to serious due process deprivations. When coupled with the extensive and unexplained delays of the government in commencing the legal proceeding necessary to complete the forfeiture, the deprivations of due process here become so substantial that the question of granting the professor's summary judgment motion is not even close.

■ The facts demonstrate that this claimant has been deprived of his right to prompt and expeditious institution of court proceedings by the government.

■ As stated above, promptness and immediacy are required in all steps between the seizure and the institution of district court proceedings.

There is now a chorus of decisions holding that if the delay between the seizure and commencement of district court proceedings is substantial, unexcused and unreasonable, such delay will, on due process grounds, itself bar the government from proceeding further. How much delay has that effect seems to be a mixed question of fact and law to be decided in the light of the facts of the particular case. For example, in *United States v. One 1970 Ford Pickup, supra,* a delay of 11 months was held to bar the government. In *Sarkisian v. United States, supra,* the fatal delay was 9 months. Other cases in which the government was held barred because of delay follow, with the delay period indicated in each instance: *United States v. A Quantity of Gold Jewelry,* 379 F.Supp. 283 (C.D.Cal.1974), *aff'd in relevant part,* 554 F.2d 1072 (9th Cir. 1977) (22 months); *States Marine Lines v. Shultz, supra* (one year); *United States v. One Motor Yacht Named Mercury,* 527 F.2d 1112 (1st Cir. 1975) (12½ months); *Boston v. Stephens,* 395 F.Supp. 1000 (S.D.Ohio 1975) (claimant filed action 6 months after seizure); *United States v. One 1971 Opel G.T., supra* (13½ months).

■ In the instant case, the period of delay (not including the 8 weeks which claimant's counsel stipulated out of the case) was 16 months. This factor alone

would preclude the government from obtaining a judicial foreclosure.[16]

The government seeks to distinguish the cases just discussed from the instant case. The attempted distinction involves a first impression question.

The government argues that it cannot be barred because of its delay in instituting district court proceedings unless the claimant shows that he has suffered some economic prejudice resulting from the delay. The government points out that almost all of the previous cases involve seizure of a depreciating asset, such as a car [17] or boat,[18] where economic prejudice is clear.[19] Such an item declines in value every day or month that the government procrastinates. Some other cases involve clear economic prejudice of a similar kind. In *A Quantity of Gold Jewelry, supra,* the goods seized were imported to be part of a merchant's stock in trade, so every day the government withheld the goods deprived the merchant of his right to sell them and make an immediate profit on them. In *States Marine Lines v. Shultz, supra,* the seized cargo had been resold so the claimant faced liability for breach of contract because of the delay. The government says that the instant case involved no economic prejudice and thus, its delays should not be held to involve a violation of due process rights.

In reply, the professor argues that a showing of economic prejudice in terms of a pecuniary loss is not required in order to invoke due process rights. I agree. A showing of economic prejudice, meaning out-of-pocket loss, is, in my view, not a *sine qua non* of a due process violation.

 The Supreme Court has said that a violation of property rights may give rise to a due process claim within the same general parameters as a violation of personal rights. *Lynch v. Household Finance Corp.,* 405 U.S. 538, 552, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). Under the instant facts, it cannot be doubted that a serious impairment of the professor's property rights has occurred. A customs seizure of this type puts all of the owner's property rights in limbo. He is deprived of possession and his ownership of the property is questioned and put in jeopardy. Such impairment of property rights might well be called "economic prejudice" if there is any magic in that terminology. But whether it is called "economic prejudice" or not, such impairment of property rights, if long enough continued, is in my view a sufficient predicate for the successful invocation of the due process clause.

To escape the results of its egregious conduct, the government asserts that it is not barred because Professor Brokensha could and should have taken the initiative in various ways and could thus have obviated the effects of the government's procedural deficiencies and delays. The government argues that the professor could and should have either demanded referral of the action to the U. S. Attorney sooner, or filed a mandamus action in district court to compel reference of the case to the U. S. Attorney, or filed some type of possessory action.

16. Of course, delay attributable to the claimant may excuse the government from its obligation to proceed promptly with the litigation. *See, e. g., United States v. One 43 Foot Sailing Vessel,* 405 F.Supp. 879 (S.D.Fla.1975). However, there is no delay in the instant case which is attributable to Professor Brokensha.

 A growing number of cases have held that the pendency of an administrative proceeding begun by the claimant under 19 U.S.C. § 1618 does not excuse government delay in bringing the district court action. *See, e. g., United States v. One 1971 Opel G.T., supra; United States v. A Quantity of Gold Jewelry, supra; United States v. One (1) Douglas A–26B Aircraft,* 436 F.Supp. 1292 (S.D.Ga.1977); *Boston v. Stephens,* 395 F.Supp. 1000 (S.D.Ohio 1975).

But *cf. Ivers v. United States, supra.* But even if those cases are not correctly decided and delay in instituting the court action is held permissible while an administrative claim is pending and undecided, such a holding would avail the government nothing in this case. As has been said, there was no administrative claim made and none was pending at any time.

17. *United States v. One 1971 Opel G.T., supra.*

18. *United States v. One Motor Yacht Named Mercury, supra.*

19. See also *United States v. One (1) Douglas A–26B Aircraft, supra,* decided after the briefs were submitted and involving an airplane.

For this startling proposition, the government relies exclusively on *United States v. One (1) 1973 Ford LTD,* 409 F.Supp. 741 (D.Nev.1976). Although that opinion contains some language which appears to place on the claimant a burden of taking affirmative action, the case seems readily distinguishable on its facts. In that case, the automobile had been seized because it was used for the illegal transportation of marijuana. Apparently, from the beginning, the claimant admitted that it had been used illegally and that it was properly forfeitable. After the district court case was filed, the claimant did nothing to secure a prompt disposition of it, apparently hoping that its chances of getting the car back would increase as the delay increased, despite an admittedly valid initial seizure.

■ If *One (1) 1973 Ford LTD* stands for the proposition that the claimant is obliged to initiate action to force the government to act more promptly, I decline to follow it. It seems clear to me that when the government has created the problem by seizing a citizen's property in the summary fashion employed in customs seizures (and the claimant does not immediately admit the propriety of the government's action), the claimant should not be at risk on account of his inaction and should not lose any rights on account thereof. A claimant ought not to be required to spend his own money to force the government to take action which the government is bound by law to take and take promptly. *See United States v. A Quantity of Gold Jewelry, supra,* 379 F.Supp. at 288, n. 10.

The government makes the further claim that these statues became "contraband" when they were brought into the country against the law. Harkening back to the earliest days of English constitutional history, the government says that no person can have title to or the right to possession of goods which are "contraband." Having no rights to these contraband statues, says the government, Professor Brokensha cannot complain that government action deprived him of his rights.

■ This argument must also fail. There is a distinction which was made at early common law and persists to modern times, between acts *malum in se* and *malum prohibitum.* Possession of certain kinds of property, sometimes called "contraband", is *malum in se.* The possessor or owner of such property may well be excluded from due process protection. But in my view, these statues were not "contraband" when they were imported into the country and they did not at any time thereafter become contraband. The only definition of the term "contraband" which the Court has found is at 49 U.S.C. § 781, which defines the term to include narcotics, firearms made in violation of the National Firearms Act, and counterfeit coins, securities and obligations. Imported statues of the type in question here are not included within the definition. In my view, the possession of such statues after importation, even if they were brought into the country in violation of the customs laws, is *malum prohibitum,* not *malum in se.*

A few other government contentions advanced somewhat half-heartedly in the papers may be disposed of briefly. The claim is advanced that if the government is held barred from maintaining this action, its foreign policy objectives would be thwarted. That is a bootstrap argument totally lacking in persuasiveness. If carried to its logical conclusion, it would validate any governmental violation of law involving the property or liberty of a citizen if that violation could somehow be related to a foreign policy objective. Shades of Watergate!

■ The final claim of the government is that in no case can delay bar the government so long as the five-year statute of limitations on enforcement of forfeitures [28 U.S.C. § 2462] has not expired. This assertion is equally lacking in authority as well as in logic. There is no way a court can construe a general statute of limitations as validating otherwise invalid and improper post-seizure delay.

FOR THE REASONS ABOVE STATED, the government's motion for summary judgment is denied and the claimant's mo-

tion for summary judgment is granted.[20] The government is ORDERED to return the statues in question to the claimant. A Judgment in conformity herewith will be prepared by the Court and entered.

---

20. The claimant advances two arguments which the Court has not ruled upon because it was unnecessary to do so, namely, that this seizure impinges on his First Amendment rights and that the government is guilty of laches.